UNITED STATES, Appellee

v.

LESTER H. FURNEY, Private–2, U. S. Army, Appellant

2 USCMA 270, 8 CMR 70

No. 1008

Decided March 5, 1953

LT. COL. George M. Thorpe, U. S. Army, for Appellant.

LT. COL. Thayer Chapman, U. S. Army, and 1ST LT. Robert A. Forman, U. S. Army, for Appellee.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted by general court-martial in Korea of unpremeditated murder and was sentenced to dis-

honorable discharge, total forfeiture of pay, and confinement for twenty-seven years. The convening authority approved and the board of review affirmed but reduced the sentence of confinement to fifteen years. We granted the accused's petition for review limited to the issue of the sufficiency of the law officer's instructions on the elements of the offense charged.

The accused was attached to an Army ordnance company located at Pol Mol, Korea, in an area approximately seven to ten miles from the front lines. Republic of Korea soldiers were attached to the unit and used on guard duty. On the night of the incident here involved, the guard consisted of Sergeant Parker, Private First Class McCrillis, Private Dubicki and Kim San Dol, a Korean soldier. Private McCrillis testified that at about 10:45 p.m. the accused and three Koreans came to his guard post. The accused seemed to be arguing with the Koreans, and McCrillis thought he appeared intoxicated. McCrillis ordered them to leave the area. The accused remained and told McCrillis that he had been drinking and that one of the Koreans had taken a knife from him.

Shortly after midnight, McCrillis, still on guard, heard a "mumbling" sound "down at the end of the row of tents." He flashed his light in that direction and saw, briefly, a figure which he could not identify. Immediately, someone started firing. McCrillis extinguished his light. Sergeant Parker, in his tent in the area, heard a commotion followed by firing. Someone called for the corporal of the guard. Sergeant Parker ran in the direction of the commotion and encountered the accused. The latter was "in an excited condition" and appeared to have been drinking. He stated that while he was in the latrine three "Gooks" passed down the road. He ordered them to halt and when they did not and started to run, he opened fire on them. Private Dubicki, who arrived on the scene shortly after Sergeant Parker, corroborated the latter's testimony, as to the accused's remarks. Parker went on and found the Korean soldier, Kim San Dol, lying on the ground covered with blood. He was later examined and found to be dead from gunshot wounds.

It was established by the evidence that it was very dark on the night in question. Personnel had been instructed to carry arms at all times. Enemy prisoners had been brought in occasionally and were confined in a nearby tent. There was also a graves registration unit and an ammunition dump in the area.

In a pre-trial statement, received in evidence at the trial, the accused explained his actions during the evening. While looking for a Korean girl, he drank some whiskey with Koreans. Later, he discovered that his knife was missing. He related this story to a Korean soldier he encountered and went with the Koreans toward the command post of the unit. While on the way, a guard stopped them. He related an untrue story to the guard about being in a Korean house of prostitution and having both money and knife taken from him. The guard told them to return to their quarters, and the Koreans departed. Later the same evening, he left his tent to visit the latrine, carrying his carbine in accordance with existing orders. While sitting in the latrine, he heard someone running, shouted "halt" three times, fired a shot in the air and, when the persons did not stop, fired in their direction. He then called the corporal of the guard and discovered that he had shot a Korean.

It is contended by the defense that, based on this evidence, the law officer should have instructed the court on the elements of justifiable or excusable homicide. Actually, the law officer gave only the elements of unpremeditated murder. Defense also urges that the theory of "imperfect self-defense," held by some jurisdictions to warrant reducing murder to manslaughter, should have been presented to the court by appropriate instructions.

While we think that law officers should, in general, instruct more fully on the elements of the various degrees of homicide in murder cases than did this law officer, we are unable to say that there is here sufficient evidence of justifiable homicide, excusable homicide,

ór any lesser offense than that charged to say that the law officer committed prejudicial error in not instructing on those defenses and offenses. The only question is whether there was sufficient evidence to raise as a reasonable alternative to the offense charged the theory that the accused was laboring under an honest mistake of fact as to the identity of his victim. If he was not, then there can be no doubt as to the correctness of the findings and the instructions.

The only indication of mistake of fact contained in this record lies in the statements of the accused. The substance of his story was that he thought the unknown person or persons fired at to be enemy soldiers. If the facts were equivocal in this respect, and if the accused's story were consistent and straightforward, we would be inclined to the view that this would be sufficient to raise the defense theory as a reasonable issue. However, there are many facts in the record which clearly controvert this theory and the accused's stories were not consistent nor reasonably believable. Neither McCrillis nor Parker—both of whom were quite close to the incident—heard anyone shout "halt." The body was found some twenty or twenty-five yards from the latrine and the witnesses agreed that it was impossible to see further than three or four feet without a light on the night in question. If this be true, it is difficult to see how the accused could have had any reasonable basis for belief that the person or persons running were enemy—particularly since he knew that there were Korean guards in the area. Immediately after the incident, the accused referred to the persons at whom he fired as "Gooks." In his pre-trial statement he stated that "someone" failed to heed his shouts to halt. Even taking the accused's own story to be true, it is difficult to find justification where a soldier, not on guard, fires at a figure on a dark night in the company area without taking any more precautions than did this accused. If the accused did not fire until McCrillis' flashlight lighted up the figure, then there was even less excuse for the shooting since the Korean was dressed in a GI fatigue unform, was known to the accused, and the latter well knew that Korean guards were used by the company.

We think that, under the evidence in this case, the law officer would have been justified in disbelieving the accused's story. Even if he had believed it, it is still difficult to say that a reasonable issue of justification, excuse or imperfect self-defense was raised thereby. Since the defense theory did not constitute a reasonable alternative to the offense charged, we cannot say that the law officer committed prejudicial error in limiting his instructions to the elements of unpremeditated murder. Accordingly, the decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.