UNITED STATES, Appellee

v.

GARLON J. TROGLIN, Private First Class, U. S. Army, Appellant

3 USCMA 385, 12 CMR 141

No. 1960

Decided September 18, 1953

LT COL George M. Thorpe, U. S. Army, and 1ST LT John W. Fuhrman, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial in Pusan, Korea, for the unpremeditated murder of Private First Class Samuel L. Davis, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712. The court-martial returned a finding of guilty of voluntary manslaughter under Article 119(a) of the Code, 50 USC § 713, and sentenced him to be discharged from the service with a bad-conduct discharge, to forfeit all pay and allowances, and to be confined at hard labor for three years. The convening authority approved the findings and sentence and the board of review in the office of The Judge Advocate General of the Army affirmed. Accused's petition to this Court for a review of his conviction was granted in order that we might consider the single issue of whether the law officer was required to instruct the members of the court-martial on self-defense.

Disposition of the issue raised by the petition requires a summary of the evidence. For clarification, we set forth a floor plan of the premises where the offense occurred, and the positions of the principal characters at the time of the shooting, copied from an exhibit received in evidence, and supplemented by portions of the testimony.

Store Room

Kitchen

Serving Line

E. M. Dining Hall

Stoves

Table 8'

Shelves

•4

•3

•2 4'
 1

5

Scullery

Sergeants' Mess

Officers' Mess

N

1. Victim.
2. Position of accused as fixed by himself.
3 & 4. Positions of accused as fixed by two other witnesses.
5. Location of field jacket.

The case for the prosecution, portrayed by the fairly consistent stories of several witnesses, shows that on the evening of April 3 1952, the accused was on duty as a cook in the kitchen of the 60th Engineer Depot Company located at Pusan, Korea. At about 6:30 p.m. on that date, First Lieutenant Spehar, Security Officer of the company, met the deceased, Davis, at the guard house after the latter had been relieved from guard duty. They walked together to the mess hall, a distance of about four hundred yards. Davis' conduct and behavior were such that the Lieutenant was unaware of the fact, if it be a fact, that Davis had been drinking although some of the other witnesses concluded otherwise. Upon their arrival at the mess hall, Davis proceeded to the enlisted men's section and went to the counter where he was served his evening meal. Lieutenant Spehar went on into the officers' mess. After sitting down at the table for a short time, Davis went back to the kitchen to get some sugar. A Korean kitchen helper brought the sugar and Davis became provoked at the way it was handed to him. After telling the Korean that he would get him later, Davis returned to his seat and finished his supper. He then went into the scullery to wash his tray, again encountered the Korean, and further threats were heard. The accused, who was in the kitchen, followed Davis into the scullery and was overheard telling him that if he wanted to chastise the Korean he would have to take him outside. Davis responded to the accused in an obscene and threatening manner. When the accused and Davis began arguing in the scullery the first cook, a corporal, approached them and told accused to go back to the kitchen and Davis to leave the mess hall if he had finished eating. Davis did not leave and the corporal went to the officer's mess to summon Lieutenant Spehar. They proceeded from the officer's mess

to the kitchen and while passing through the sergeant's dining room heard three shots. The Lieutenant walked to the scullery door, opened it, but seeing no one went back around through the enlisted men's dining room to the kitchen. Upon entering the kitchen from that direction he noticed Davis lying on his back in the doorway leading from the kitchen to the scullery, his feet about two feet over the door sill. There was no weapon of any kind in his hands. The accused was standing approximately four feet from the dining room entrance and was on the left side of the Lieutenant as he entered the room. The officer noticed the accused put the gun in the pocket of his field jacket which was hanging on a spike on the wall near the entrance from the enlisted men's mess. One witness, who entered the kitchen from the dining room immediately after the shots were fired, saw accused standing seven or eight feet from the scullery door. He testified that Davis was still standing upright when he entered the kitchen but immediately fell to the floor. The kitchen contained two large work tables. One of these, which was about three and one-half feet high, four feet wide and eight feet long, was about four feet from the scullery door and the deceased was lying so that his feet were about one and one half feet to three feet from the table. It was situated in such a manner that a direct pathway from the end of the stoves to the dining room door was provided. A large carving knife about 14 to 16 inches long was on the corner of the table nearest the deceased. Lieutenant Spehar took the gun from the pocket of accused's field jacket and subsequently turned it over to the CID agents. A careful search was made of the scullery but no other weapon was found.

At the time of the shooting, and afterwards, there were several Korean KP's present in the scullery and in the kitchen. One witness, a Korean national, testified that he was standing in front of the service counter when he heard three shots. He said that the accused was standing between the stoves and the table and closer to the opposite end of the table than to Davis, and approximately fifteen feet from Davis who was standing in the scullery doorway.

A CID agent testified that he and another agent interrogated the accused and after advising him of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, had received an oral statement. In this statement accused said: He had heard Davis in the scullery and went in and told him not to scuffle with the Korean guard; that if he wanted to punish him, he should take him to the guardhouse; that he returned to the kitchen and Davis followed; that when Davis entered the kitchen, accused saw him pulling a medium-sized knife out of his pocket; that the accused obtained the gun from the pocket of his field jacket, which was hanging on a nail in the kitchen, by the exit into the dining hall; and that he fired three times at Davis to protect himself. When the agents asked him why he did not retreat to the dining room, the accused made no answer.

The accused took the stand in his own defense and testified that while he was on duty as second cook, he had seen Davis and Lieutenant Spehar enter the mess hall; that the deceased had been served food on a tray and then asked for sugar; that it appeared to the accused that the deceased had been drinking; that after he had finished eating, the deceased went to the scullery room; that the accused heard an argument and entered that room; that he saw deceased holding a Korean and asked what the trouble was; that he told the deceased that if he was going to make any trouble he would have to take the Korean outside or to the company guardhouse; that the deceased replied with threats against both the Korean and the accused; that the Korean walked off and the accused returned to the kitchen where he went to the stoves to attend to the cooking; that when he raised up from the stove he saw Davis in the scullery door; that Davis entered, drew a knife, and, uttering a threat, started between the table and the scullery door; that Davis was about three and one-half feet away when accused drew his gun out of his pocket and fired; that after being shot, Davis threw his right hand up over his

shoulder and accused turned and walked around the end of the table to the other side next to the dining room; that he unloaded the empty cartridge cases and put them in the garbage can; that he then placed the gun in his jacket pocket; and that Lieutenant Spehar then came in and took the gun. The accused further testified that he had never had any trouble with the deceased before; that the deceased was about six feet two inches tall and weighed 170 or 180 pounds and that the accused is five feet five and one-half inches tall and weighs 141 pounds and is 35 years old. The accused stated that earlier in the day he had heard there was to be a shakedown in the barracks and that he had taken the gun from his footlocker and put it in the pocket of his jacket so that it would not be found during the inspection. He further stated that he put the weapon in the pocket of his "whites" about a half hour before the shooting to keep the Koreans from getting possession of it.

At the conclusion of the evidence, and after arguments by counsel, the law officer instructed the court-martial on the elements of unpremeditated murder. He advised that the offense of voluntary manslaughter was included in the allegation as a lesser offense and gave the elements thereof. He also instructed on the elements of involuntary manslaughter and certain types of assault. In addition, he informed the members of the court-martial that if they had a reasonable doubt as to whether the accused had committed the greater or lesser offenses they should return a finding of guilty of a lesser offense as to which there was no doubt. Defense counsel made no request for an instruction on self-defense, nor did they object to the instructions as given.

We have previously held that when self-defense is raised reasonably by the evidence, the failure of the law officer to instruct thereon constitutes prejudicial error, even in the absence of a request by counsel. See United States v. Ginn, 1 USCMA 453, 4 CMR 45, decided July 10, 1952. However, we have emphasized in many cases that the requirement for such an instruction emanates from the evidence and the issues raised thereby. United States v. Benavides, 2 USCMA 226, 8 CMR 26, decided February 20, 1953; United States v. Furney, 2 USCMA 270, 8 CMR 70, decided March 5, 1953. We stated the rule in the *Ginn* case, *supra*, as follows:

"It does not follow from what we have said that there must be an instruction on self-defense under every charge of willful and unlawful killing. Where there is no predicate whatsoever in the evidence—either defense or prosecution—for an inference of self-defense, it would be a useless and even confusing gesture to charge the court on this issue. On the other hand, if it clearly appears from the evidence that there is a sound theory of self-defense, an appropriate instruction must be given. We are here confronted with the necessity of establishing a test for cases which, like the one under discussion, fit neither of these extremes. . . .

". . . We are persuaded that, since the duty to instruct on self-defense must spring from the same source as, and is directly related to, the duty to instruct on lesser included offenses, the same test should apply in each instance. There must be some evidence from which a reasonable inference can be drawn that the affirmative defense was in issue. This view is entirely consistent with the test established by most civilian criminal courts. See State v. Greer, 218 NC 660, 12 SE2d 238; Mack v. State, 185 Ga 415, 195 SE 179; Noe v. Commonwealth, 290 Ky 194, 160 SW2d 866; Prater v. State, 142 Tex CR 626, 155 SW2d 934; Soucie v. State, 218 Ind 215, 31 NE2d 1018."

In line with that rule, we must test the evidence adduced in the case at bar and determine whether it was sufficient to require the law officer to instruct on self-defense without any request therefor. The elements of self-defense are discussed in paragraph 197c, Manual for Courts-Martial, United States, 1951, as follows:

". . . To excuse a person for a killing on the ground of self-defense, he must have believed on reasonable

**389**

grounds that killing was necessary to save his life or the lives of those whom he might lawfully protect, or to prevent great bodily harm to himself or them. *The danger must be believed on reasonable grounds to be imminent, and no necessity will exist until the person, if not in his own house or at a place where he has a duty to remain, has retreated as far as he safely can. . . ."* [Emphasis supplied].

The Manual adopts a rule which appears to be more strict than the one adopted by some courts in the civilian community, but nevertheless one which finds support in reliable authorities. Before quoting from and discussing the various rules, we direct attention to the fact that reserved from this discussion are those military cases involving persons who must remain on duty at a given post and civilian cases where there is no duty to retreat because the victim is assaulted in his home. 26 American Jurisprudence, Homicide, § 137, pages 249–250, states the rule as follows:

"The right to kill in self-defense is founded in necessity, real or apparent. The right exists only in extremity, where no other practicable means to avoid the threatened harm are apparent to the person resorting to the right. If there was under the facts of the particular case at bar no real or apparent necessity for the killing, the defense completely fails, and the slayer will be deemed guilty of some grades of culpable homicide. In order successfully to assert self-defense as an excuse or justification for a homicide, the defendant must have been in imminent danger of death or great bodily harm at the time of committing the homicidal act, or must have had reasonable grounds for believing and did in good faith believe that he was in such peril and that the killing was necessary to avert such peril, and must have had no other reasonable means of avoiding death or injury— no avenue of escape—open to him. . . ."

It is clear from the Manual rule that when we test the sufficiency of the evidence to determine the presence of an issue of self-defense a dual standard must be applied. First, danger of death or great bodily harm must be, or reasonably appear to be, imminent; and second, the threatened person must retreat as far as he safely can. In applying the rule, difficulty is encountered in determining the extent of the duty to retreat imposed by the second part of the test. In the majority of jurisdictions, the common-law doctrine of "retreat to the wall" has been modified or abrogated and we do not interpret the language of the Manual to place that much of a burden on the one being threatened with harm. However, no unanimous rule has been adopted and the divergent views are illustrated by the following excerpt from 18 American Law Reports 1279:

". . . In a few jurisdictions it is maintained broadly that a person assailed is not justified in taking the life of his assailant if he can escape from danger by retreat. In other jurisdictions it is held that, if a person is assaulted in a place where he has a right to be, he may stand his ground, meet force with force, and, if need be, kill his assailant. Another line of cases adheres to an intermediate view that, if the assault is felonious, producing imminent peril of death or great bodily harm, there is no duty to retreat therefrom. These views, while essentially variant, have some tendency to overlap, since the cases insisting most strictly on the duty to retreat admit an exception in cases where the nature of the assault and the conduct of the assailant are such that danger would be increased rather than averted thereby, a doctrine differing only in degree from the intermediate view heretofore stated, which is apparently based on the belief that retreat from a felonious assault with a deadly weapon involves a hazard which the law does not force on a man who is assailed, without fault on his part. . . ."

A leading case on the doctrine of retreat is Brown v. United States, 256 US 335, 65 L ed 961, 41 S Ct 501, 18 ALR 1276. There the victim and the defendant had been at sword's point for some time, and the former had assaulted

the latter twice and threatened to kill him. On the day of the homicide, the defendant was superintending excavation work. The victim approached with a knife. The defendant retreated twenty or twenty-five feet and obtained a pistol. The victim was striking at him when he fired four shots and killed him. The judge instructed to the effect that defendant was "always under the obligation to retreat so long as retreat is open to him, provided that he can do so without subjecting himself to the danger of death or great bodily harm." An instruction that if defendant had reasonable grounds to believe death or great bodily harm were imminent he was not bound to retreat was refused. The United States Supreme Court, speaking through Mr. Justice Holmes, held the instruction erroneous. The Court stated:

"It is useless to go into the developments of the law from the time when a man who had killed another, no matter how innocently, had to get his pardon, whether of grace or of course. Concrete cases or illustrations stated in the early law in conditions very different from the present, like the reference to retreat in 3 Co. Inst. 55, and elsewhere, have had a tendency to ossify into specific rules without much regard for reason. Other examples may be found in the law as to trespass ab initio (Commonwealth v. Rubin, 165 Mass 453, 43 NE 200), and as to fresh complaint after rape (Commonwealth v. Cleary, 172 Mass 175, 51 NE 746). Rationally, the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; not a categorical proof of guilt. The law has grown, and even if historical mistakes have contributed to its growth, it has tended in the direction of rules consistent with human nature. Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievout bodily harm from his assailant, he may stand his ground, and that if he kills him, he has not exceeded the bounds of lawful self-defense. That

has been the decision of this Court. Beard v. United States, 158 US 550, 559, 39 L ed 1086, 1090, 15 S Ct 962, 9 Am Crim Rep 324. Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore, in this Court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety, or to disable his assailant rather than to kill him. Rowe v. United States, 164 US 546, 558, 41 L ed 547, 551, 17 Sup Ct Rep 172. . . ."

We are of the opinion that the ruling in the Brown case, *supra,* does not differ substantially from that prescribed by the Manual. Both represent, to some extent, a modification of the common-law doctrine of "retreat to the wall." On the other hand, neither requires a holding that any killing to repel a threat must be excused without regard to the imminence of danger or the availability of other means of avoiding the killing. The basis of self-defense as an excuse for the taking of life is the reasonable necessity therefor, and the question of whether such extreme action may be excused must rest in the facts and circumstances presented by the evidence, of which the possibility of retreat is only a part. That other courts have interpreted the *Brown* decision in this light is reflected by the decision of the United States Court of Appeals for the District of Columbia in Josey v. United States, 135 F2d 809. There the defendant contended that the prosecuting attorney had committed reversible error in asking the defendant, on cross-examination, why she had not run from her assailant to a place of safety. The appellate court stated:

". . . Appellant relies upon Brown v. United States, in which the Supreme Court held, among other things, that if a person reasonably believes he is in immediate danger of death or grievous bodily harm from his assailant, he may stand his ground; and that, if, under such circumstances, he kills his assailant, he has not exceeded the bounds of lawful self-defense. But the Supreme Court also said, in that case: 'Rationally the

**391**

failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; . . . .' Appellant's argument assumes, improperly, that the two propositions are mutually exclusive. What the Court said was in rebuttal of the old doctrine that one must retreat 'to the wall,' whatever the circumstances may be, in order, successfully, to invoke self-defense. It explained that such illustrations, stated in the early law, 'have had a tendency to ossify into specific rules without much regard for reason.' But the Court did not by any means repudiate the requirement that one must reasonably believe he is in immediate danger of death or of grievous bodily harm, in order to justify a deadly assault in self-defense. . . ."

We are of the opinion that when analyzed properly, the rule announced by the Federal courts is substantially this: Assuming danger is imminent, before a killing can be ex- ■ cused the killer must assume the duty to retreat; that duty is measured by the force and imminence of the danger and the availability of an opportunity by which the accused may retreat reasonably without increasing his peril. It is by that touchstone which we measure the evidence in the instant case. Because we are ·determining the sufficiency of the instructions, we will view the record in the light most favorable to the accused except as to one alleged fact which was testified to solely by the accused, but which is so inconsistent with all the other testimony, facts and circumstances, and so inherently improbable as to be unworthy of belief. That fact is that the victim had a knife in his hand. There was no serious difficulty between the two parties and no real motive for an assault with a knife is suggested. The victim was killed in his tracks, falling·at the doorway between two rooms. One witness saw the victim before he fell, three others came on the scene immediately thereafter. While the accused claimed the victim drew a knife from his pocket, no one other than ac-

cused observed a knife in the hand, on the person, or near the victim. The only knife observed by others was the one lying on the table which was not connected with the victim in any way. Searches were conducted in both rooms at different intervals, from immediately after the shooting until some one and one-half hours later, but a knife was never found. While a number of kitchen hands milled around and there is a bare possibility that someone picked it up either to steal it or to conceal evidence, the probability of that occurring is so remote as to be without substance, particularly when the kitchen crew was not favorable to the victim.

With that limitation in mind, we review the evidence relating to the imminence of danger and the ■ failure to retreat. We must determine whether danger was imminent from the version given by accused at the time of the trial even though it is at variance with his story told immediately following the shooting. His first version was that he obtained, his gun from his field jacket and fired the fatal rounds from near that position but this is the most unfavorful version for the accused as it placed him at a distance of approximately fifteen feet and obviously danger was not imminent. His trial version was that he had placed the pistol in his pocket some twenty or thirty minutes before the incident. If this be the fact, then he was well aware that he carried an effective means of protecting himself. Armed with the weapon, the accused had some advantage over the victim as distance favors one who is armed. Of all the witnesses who testified, accused testified to the shortest distance between himself and the victim. He fixes the distance at approximately three and one-half feet; other witnesses stated it was some eight to fifteen feet. Under any version, there was no contact between the two and while the difference in height and weight favored the victim, danger to the accused was less imminent than it was to the victim. One possessed of a loaded weapon is hardly in a position of imminent danger from one unarmed even though only three and one-half feet intervened.

Moreover, assuming the victim possessed a knife, the advantage was still with the accused. The victim could not have proceeded into the kitchen any substantial distance as, when he was shot, he fell with only about one and one-half feet of his lower limbs projecting into the kitchen. He must have, therefore, barely passed through the door when he was shot. Accused's version suggests that when the victim came through the door, he paused on the threshold of the kitchen and as he started forward he was shot by the accused. The evidence fails to show that the victim committed any overt act such as lunging forward or striking at the accused, and the physical facts point unerringly to a shooting just as the deceased started into the kitchen. Either the victim paused as he entered and thus gave the accused time in which to draw his weapon and fire, or the accused anticipated he would appear and had the weapon ready. In either event, we do not find, in the record, the imminence which would justify the taking of a life.

The second element of the defense deals with retreat. We find absolutely no attempt on the part of the accused to seek a haven of safety and, yet, there was an opportunity reasonably present which could have been seized without increasing the hazards. This total failure on the part of the accused is fatal to his defense regardless of whether the victim possessed a knife; although if he did, the probability of the accused thinking clearly is lessened. However, the accused had worked in the kitchen, knew the physical layout and knew the dining room was readily accessible. He could have moved back into there without subjecting himself to any increased hazard. He likewise knew the mess hall was occupied by persons who might come to his aid. When the victim appeared at the door, the accused could have moved to the rear through an unobstructed passageway between the table and the stoves. He had a certain amount of protection in front of him because the end of the table would have interfered with the forward movement of the victim. The accused covered the victim with a pistol but made no attempt to use it as a protective devise. A warning that he might shoot unless the victim desisted, or a pointing of the gun for a sufficient length of time to permit the deceased to appreciate the danger, probably would have saved a life. While detached reflection cannot be demanded in a fast moving situation, some consideration must be given to the possibility of retreating, or the doctrine announced in the Manual must be disregarded. We cannot refuse to accept the principle so that before we will find an issue of self-defense it must either appear that an accused was foreclosed from retreating or that he made some reasonable effort to do so before he killed. Sometimes the *res gestae* acts and exclamations of an accused speak much louder than his words. In this instance both do not add up to self-defense but here are his acts. Without a word of warning, he shot the victim three times, he had the mental acuity to extract the cartridge cases, conceal them in a garbage can, put his weapon away in a jacket, and say to the first officer who appeared on the scene "that is one . . . who will not bother me anymore." That indicates the atmosphere may have been filled with heat of passion created by adequate provocation but that it was not filled with the necessity of killing to defend against the possibility of death or grievous bodily harm.

For the foregoing reasons we do not believe self-defense was reasonably raised as an issue. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.