UNITED STATES, Appellee

v

WILLIAM L. SMITH, Private First Class,
U. S. Army, Appellant

13 USCMA 471, 33 CMR 3

No. 16,124

March 1, 1963

 ██

*Captain Thomas Stapleton* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph Herrod.*

*Captain Otis D. Chapoton* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

As a consequence of his acts on the evening of the incident with which we are here concerned, the appellant was brought to trial before a general court-martial, convened in Germany. He pleaded not guilty, but was convicted of assault whereby serious bodily injury was intentionally inflicted, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for three years, and reduction to the lowest enlisted grade. The convening authority approved and, thereafter, a board of review affirmed the findings and sentence.

The uncontroverted evidence reflects that the entire transaction here involved took place in an enlisted men's club on pay day. The appellant, Smith, and Bernardoni, the alleged victim—both enlisted men—were present at the club that evening. All persons involved were in a place where they had a right to be. Around 8:30 p.m. appellant went into the club latrine. Shortly thereafter the victim also entered. At this time a third man was in the latrine. From this point there is total lack of agreement as to what transpired. We shall first recount the version espoused by the prosecution and supported by the testimony of the victim and other witnesses.

Bernardoni asserted that, when he entered the latrine, the appellant and a third party, whom he did not recognize, were engaged in an argument. The victim, who stated he did not know the appellant, claimed that as he was about to leave the latrine, the third party went out the door. That left just the two men present, and appellant thereupon turned toward Bernardoni and directed a derogatory remark to him. Without provocation, appellant then swung at the victim as if to strike him with his fists. For that reason Bernardoni grabbed appellant by the arm and pushed him back against the wall, "to keep him away from me." Appellant persisted, however, and struck him on the head. Bernardoni, who stated he began to bleed, but did not then realize the seriousness of the wound,[1] testified appellant began to wrestle with him, and the two men

---

[1] It was subsequently developed, we note, that the victim suffered a stab wound of the forehead—apparently from a knife in appellant's hand.

fell to the floor. During the course of this struggle, the victim was stabbed numerous times on his back, abdomen, groin, chest, lip, and thumb. Bernardoni further testified that at various times during the fight, three or four men came into the latrine. No one else was involved in any way, however, and no one attempted to help either party. The fight was ended when an employee of the club entered and yelled for them to stop. Thereupon the appellant jumped up and ran out of the latrine. The victim managed to stand up and walk out of the room, but he soon became unconscious and was taken to a hospital. There he underwent surgery for his injuries and was kept as a patient for some fifty-one days.

Other bits of evidence complete the picture painted by the prosecution. Witnesses unaware of what had occurred inside saw appellant run from the club. His clothes were bloodstained and, when they stopped him and inquired as to what was wrong, appellant gave them a false name. It was also established that the broken blade of appellant's knife was recovered from a drain in the latrine, and the handle of the pocket knife was found outside a window of that room, where it had been thrown. Finally, the Government introduced appellant's pretrial statement, in which he admitted cutting Bernardoni in the fight and subsequently disposing of his bloody clothes.

There is no dispute over the fact that appellant and Bernardoni fought in the club latrine, nor that the latter received his knife wounds in the course of the altercation. Beyond that, however, according to the defense evidence, the facts differed markedly from those presented by the Government. Appellant appeared as a witness in his own behalf, and his version of the incident is substantially as follows.

He testified that he was approached in the latrine by a man who made an indecent and revolting proposal, for which reason appellant told him to get away from him. At this point the alleged victim—later identified as Bernardoni—entered, together with yet another man. As he walked past appellant, Bernardoni jostled him. Moments later, the alleged victim once more came by appellant and again bumped into him. Appellant attempted to ignore his antagonists and headed for the door. When the victim turned and "said something," however, appellant stopped and asked "what was he trying to do." Bernardoni thereupon made another remark and struck out at appellant, hitting him.

The blow staggered appellant, and he averred that, as he fell back a few steps from the force of the blow, he was immediately set upon by the man who had previously made homosexual overtures. The latter attempted to open the fly of his trousers, and Bernardoni again hit him, this time knocking him to the floor. The alleged victim then got astride appellant, threatening him and pounding his head against the floor— which the record indicates was made of concrete.

Appellant's further description of what then transpired will be set forth hereinafter, that it may be readily available in connection with our discussion of the following issue, upon which we granted the instant petition for review:

"Whether the instructions on self-defense (R. 137) were correct in referring to 'like degree of force' and 'retreat.'"

Before coming to grips with the principal questions presented, we deem it appropriate to pause and direct our attention to an ancillary matter. Thus, it is urged by the defense that the law officer failed to tailor his instructions to the factual situation presented. Appellate defense counsel submit that the evidence produced a state of case in which the members of the court-martial, if properly instructed, could have concluded appellant was viciously attacked and thrown to the floor of the latrine; that his assailant was on top of him and pounding his head against a cement floor; and, therefore, that the issue was squarely raised as to whether appellant's actions were in self-defense. Under such circumstances, the contention proceeds, the law officer had the obligation to submit this factual situation to

the court-martial as a proper guide to it in resolving the issue of self-defense.

On the other hand, Government appellate counsel argue that the law officer's instructions need not detail the factual situation involved, but must merely clarify the issues raised for decision so as to constitute a "meaningful submission" of these issues to the court-martial. Counsel for the Government conclude that "only when the legal significance of certain facts is unclear must some explanation be given of these facts."

Both defense and Government appellate counsel cite United States v Acfalle, 12 USCMA 465, 31 CMR 51; and United States v Shanks, 12 USCMA 586, 31 CMR 172, in support of the position taken. The defense, in addition, cites United States v Odenweller, 13 USCMA 71, 32 CMR 71.

We find nothing in the authorities cited to indicate that this Court has ever suggested a narrow or grudging course be followed by law officers—or, in special courts-martial, by presidents—in charging court members on the law. The darkness of misunderstanding may obscure the import of certain facts but, when they are scrutinized through the spectacles of intelligence, the truth may more easily emerge. In short, justice tends to flourish in an enlightened atmosphere. The requirements of the law foster it, and the intent of this Court has always been to encourage that situation. Thus it is required, ■ inter alia, that instructions be given at trial not only on the elements of the offense but, in addition, on all issues, defenses, and lesser offenses raised reasonably by the evidence. The court members must be furnished with the law pertinent to the facts developed in order that they may resolve the issues before them. And, of course, an abstract statement of law may not suffice to insure intelligent determination of the questions posed.

Lest there be room for any uncertainty in the mind of anyone, therefore, we deem it appropriate to elaborate on the sense in which this Court has used the terms "tailor," and "tailoring." What

is contemplated is the affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them. A liberal application of this approach will avoid the possible pitfalls that may attend instructing on barren and abstract legal principles in a vacuum. In any case, it surely benefits both parties to a proceeding, and obviously enhances the quest for truth and justice in a truly enlightened atmosphere. As an example of the manner in which one trial court submitted an issue such as that presently before us, tailored to the facts of the case, and as illustrative of the care required in covering all aspects of the case, we call attention to Meadows v United States, 82 F2d 881 (CA DC Cir) (1936).

In the case at bar the law officer advised the court-martial, in connection with his instructions on ■ self-defense, that "a person may lawfully meet force with a like degree of force in protecting himself." As we have previously indicated, the adequacy of instructions going no further is questionable, and the inclusion of the phrase should be discontinued. United States v Acosta-Vargas, 13 USCMA 388, 32 CMR 388. The court-martial should be instructed that one is entitled, in self-defense, to use such force as he believes on reasonable grounds to be necessary, in view of all the circumstances of the case, to prevent impending injury.

We reiterate that the language "meet force with like degree of force" should be eliminated from instructions on self-defense. As we pointed out in Acosta-Vargas, supra, it does not, alone, properly express the correct concept and it warrants amplification. Nor is it of any consequence that such phrase is contained in the Manual for Courts-Martial, United States, 1951. The inclusion therein of any such statement of substantive law generates no validity for the same. Such is quite unlike the Executive promulgation of a mode of proof therein, pursuant to the authority conferred by Congress in the Uniform

474

Code. United States v Smith, 13 USCMA 105, 32 CMR 105.

However, in this case, the law officer did not limit his instructions to the bare statement quoted above. In addition, the court-martial was charged that the accused should be excused from using force likely to result in grievous bodily harm in defense of himself if he believed on reasonable grounds that the use of such force was necessary to save his life or to prevent serious harm to himself and that the danger of being killed or receiving great bodily injury was imminent. The law officer also instructed properly on the burden of proof and that self-defense is a complete defense for the offense of assault; concluding that, unless the court was satisfied beyond a reasonable doubt that the accused did not act in self-defense, the court-martial must acquit him. Thereafter the law officer explained to the triers of fact that a knife—the force used by accused—may be a dangerous weapon depending on the use to which it is put, just as the fists of an amateur fighter and the pounding of the head on the floor—the force allegedly utilized by the purported victim—might also constitute employment of dangerous weapons; that it was for the court to determine whether the particular means were used in a dangerous manner or so as to make great bodily harm likely. Thus did the law officer amplify and give color to his advice concerning the quantum of force to which resort might permissibly be made in self-defense.

But that is not all. The court-martial was also instructed that if the accused, because of prior acts of the victim, reasonably believed his life was in danger or if, to prevent great bodily harm to himself, he drew the knife only to create in the victim's mind an apprehension that if the victim continued the attack in spite of this he would use the knife in defense, and that the accused did not intend the subsequent wound, the court-martial must find accused not guilty.

Further, the law officer gave a proper charge on evidence of accused's charac-

ter. Also, immediately after the above instruction, he advised the court-martial, with respect to the issue whether accused was acting in self-defense, that the defense had introduced evidence tending to show that the alleged victim had a violent character. Further, he explained that the law recognizes a person having a violent character is more likely to become an aggressor than is a person having a peaceable character; and that evidence of the alleged victim's violent character, therefore, might reflect on the probability that the latter was the aggressor as to the accused. Thus the law officer admonished the court of the relevance of such evidence to the issue of self-defense as a matter which should be considered by them and weighed in connection with other pertinent factors in resolving that issue.

We note that each of the matters above-mentioned and included in the instructions were reasonably raised by the evidence. No other elements were included in the defense theory of the case. We commend the law officer for his diligent effort in tailoring his instructions on this phase of the case to the evidence developed at the trial before him. In light of this action by the law officer, there is no risk that the use of the phrase "like degree of force" misled the court members into employing an inappropriate standard in considering the question. United States v Acosta-Vargas, supra.

Before leaving this question, we advert once more to Department of the Army Pamphlet No. 27–9, Military Justice Handbook: The Law Officer, April 1958, page 5 generally, and particularly page 145 where, regarding self-defense instructions, this admonition appears:

"Because of the complex legal problems that may be involved in a particular case in which self-defense or defense of another is in issue, the law officer should use the following form instructions as a guide only. He should draft his instruction in this regard carefully, having due regard for the particular facts of the case before him."

We endorse the caveat therein contained and commend it to the considered at-

**475**

tention of those who must prepare advice for court members. The preparation of all instructions, we appreciate, involves much thought, study, and painstaking effort. Instructions on self-defense are particularly difficult and must be drafted with particular reference to the facts developed in the case on trial. It should be borne in mind that if the issue of self-defense is actually present in a case, it is one of the highest and most valuable defenses known to the law. Conceding there are attempts to abuse it and efforts to resort to such defense when not actually present, it must be remembered that the law of self-defense has its origin not solely from statutes and decisions, but from the higher law of nature. We agree that its complex nature renders it impossible for those who drafted the handbook as a guide to provide stereotyped instructions to cover the same. Likewise, it is impossible for this Court to give exact guidelines, in advance, which could cover every case which may arise. Each turns on its own peculiar facts, and it becomes particularly necessary for the law officer in each case to be aware of the specific facts before him and the theories of the case developed by the Government and the accused, respectively. We can do no more than express our view as to the basic elements of self-defense as the same are presented to us.

Directing our attention to the other aspect of the granted issue, we do not propose to delve into a long and tortuous history of the obligation to retreat in connection with self-defense. A reading of the oft-cited and scholarly article by Professor Joseph H. Beale, Jr., 16 Harvard Law Review 567 (1903), entitled "Retreat from a Murderous Assault," will provide a detailed history of the subject. The exhaustive annotation appearing in 18 ALR at page 1279, entitled "Homicide: duty to retreat when not on one's own premises," will provide further particulars on the duty to retreat, its modification, or repeal.[2] Also see annotation to Young v State, 74 Neb 346, 104 NW 867 (1905), which may be found at 2 LRA (NS) 66.

There has been a seeming conflict in the decisions of the Supreme Court of the United States on the duty to retreat. Professor Beale, in his article, points out the conflict in that Court between Beard v United States, 158 US 550, 39 L ed 1086, 15 S Ct 962 (1895); and Allen v United States, 164 US 492, 41 L ed 528, 17 S Ct 154 (1896).[3]

In 1921, when Mr. Justice Holmes wrote the decision of the Supreme Court in Brown v United States, 256 US 335, 65 L ed 961, 41 S Ct 501, this ap-

[2] Parenthetically, we note that annotation is to the case of Brown v United States, 256 US 335, 65 L ed 961, 41 S Ct 501, a United States Supreme Court decision of which we shall speak shortly.

[3] Both cases were tried in the United States Circuit Court for the Western District of Arkansas before Judge Isaac Parker, the famous "hanging judge of Fort Smith." As possibly contributing to the apparent conflicts in the Supreme Court on self-defense, it should be observed that, by the Act of January 31, 1877, Forty-fourth Congress, Second Session, Parker's court was given the powers of a circuit court. 19 Stat 230. At that time there was no appeal from a circuit court to the Supreme Court in criminal cases. Therefore, the judgment of the trial court was final. In 1889, the Fiftieth Congress, Second Session, by the Act of February 6th, provided that all convictions of crime the punishment of which provided by law is death should, upon application of the respondent, be reviewed by the Supreme Court on writ of error "allowed as of right," and be "re-examined, reversed, or affirmed by the Supreme Court of the United States." 25 Stat 655, 656. It is reported that some eighty defendants tried before Judge Parker were executed; over fifty, prior to 1889, without appeal. Harmon, Hell on the Border; Croy, He Hanged Them High; Emery, Court of the Damned; Harrington, Hanging Judge; Shirley, Law West of Fort Smith. At one time Judge Parker's district included nineteen counties in Arkansas "and the country lying West of Missouri and Arkansas, known as the Indian Territory." 19 Stat 230. Reference to the reports of the United States Supreme Court would indicate that perhaps a score of cases from Judge Parker reached that tribunal. See 138 US through 164 US.

parent conflict existed in the decisions of that Court. Justice Holmes did not mention Allen v United States, supra, but cited Beard v United States, supra, in support of his decision.

In the present instance, the law officer instructed the court-martial "a person may use force likely to result in grievous bodily harm only when retreat by him is not reasonably possible or would endanger his own safety." In this state of case, Brown v United States, supra, is peculiarly applicable, for there the trial judge instructed the jury:

> ". . . 'it is necessary to remember, in considering the question of self-defense, that the party assaulted is always under the obligation to retreat so long as retreat is open to him, provided that he can do so without subjecting himself to the danger of death or great bodily harm.' "

The trial judge in that case further instructed the jury that unless retreat would have appeared to a man of reasonable prudence, in the position of the defendant, as involving danger of death or serious bodily harm, the defendant was not entitled to stand his ground. Justice Holmes proceeded, in his opinion for the Supreme Court:

> ". . . An instruction to the effect that if the defendant had reasonable grounds of apprehension that he was in danger of losing his life or of suffering serious bodily harm from . . . [the deceased], he was not bound to retreat, was refused. So the question is brought out with sufficient clearness whether the formula laid down by the court, and often repeated by the ancient law, is adequate to the protection of the defendant's rights."

Thus, it appears as if the instruction in the case at bar, for all practical purposes, is identical with the instructions in Brown v United States, supra. And Justice Holmes there disposed of the question in the following language:

> "It is useless to go into the developments of the law from the time when a man who had killed another, no matter how innocently, had to get his pardon, whether of grace or of

course. Concrete cases or illustrations stated in the early law in conditions very different from the present, like the reference to retreat in 3 Co. Inst. 55, and elsewhere, have had a tendency to ossify into specific rules without much regard for reason. Other examples may be found in the law as to express ab initio (Com. v Rubin, 165 Mass 453, 43 NE 200), and as to fresh complaint after rape (Com. v Cleary, 172 Mass 175, 51 NE 746). Rationally, the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; not a categorical proof of guilt. The law has grown, and even if historical mistakes have contributed to its growth, it has tended in the direction of rules consistent with human nature. Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant, he may stand his ground, and that if he kills him, he has not exceeded the bounds of lawful self-defense. That has been the decision of this court. Beard v United States, 158 US 550, 559, 39 L ed 1086, 1090, 15 Sup Ct Rep 962, 9 Am Crim Rep 324. Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore, in this court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety, or to disable his assailant rather than to kill him. Rowe v United States, 164 US 546, 558, 41 L ed 547, 551, 17 Sup Ct Rep 172. The law of Texas very strongly adopts these views, as is shown by many cases, of which it is enough to cite two: Cooper v State, 49 Tex Crim Rep 28, 96 SW 1068; Baltrip v State, 30 Tex App 545, 549, 17 SW 1106." [256 US at page 343.]

The *Brown* case has not, to our knowledge, been reversed or questioned by the Supreme Court, and the language last quoted from that decision makes clear there is no Federal rule that fail-

ure to retreat is categorically proof of guilt. To repeat the statement of Mr. Justice Holmes:

". . . Rationally, the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; *not a categorical proof of guilt.*" [Emphasis supplied.]

A practical application of that rule will be found in Josey v United States, 135 F2d 809 (1943). There the United States Court of Appeals for the District of Columbia said:

"On this appeal, the first question presented concerns the law of self-defense. It is contended that the trial court erred in permitting the District Attorney to ask appellant, on cross-examination: 'If you believed the Boxley woman was going to do you some harm, and you saw a knife in her hand, why didn't you run into the house to avoid trouble?' Appellant relies upon Brown v United States, in which the Supreme Court held, among other things, that if a person reasonably believes he is in immediate danger of death or grievous bodily harm from his assailant, he may stand his ground; and that, if, under such circumstances, he kills his assailant, he has not exceeded the bounds of lawful self-defense. But the Supreme Court also said, in that case: 'Rationally the failure to retreat is a circumstance to be considered with all the others in order to determine whether the defendant went farther than he was justified in doing; * * * .' Appellant's argument assumes, improperly, that the two propositions are mutually exclusive. What the Court said was in rebuttal of the old doctrine that one must retreat 'to the wall,' whatever the circumstances may be, in order, successfully, to invoke self-defense. It explained that such illustrations, stated in the early law, 'have had a tendency to ossify into specific rules without much regard for reason.' But the Court did not by any means repudiate the requirement that one must reasonably believe he is in im-

mediate danger of death or of grievous bodily harm, in order to justify a deadly assault in self-defense. What appellant believed, concerning Virginia Boxley's conduct, and how that belief affected her, was, consequently, of vital importance. The question, propounded by the District Attorney, was calculated to search for the nature and character of her belief, and was entirely proper to determine whether appellant went farther than she was justified in doing." [135 F 2d at page 810.]

In the early case of United States v Troglin, 3 USCMA 385, 12 CMR 141, this Court cited *Brown,* supra, and quoted therefrom without stating any disagreement. Rather, it was observed in a unanimous opinion "We are of the opinion that the ruling in the Brown case, *supra,* does not differ substantially from that prescribed by the Manual." This Court went on to hold that the issue of self-defense was not reasonably raised by the evidence. It will be noted, however, that reliance was not placed on the single item of retreat but, in addition, on numerous others. Among such factors were the absence of any warning by accused; the distance between the parties; their disproportionate armament; accused's obvious awareness of an easily accessible and unobstructed route to safety; and the availability of numerous individuals in the next room who could aid accused.

Again, in United States v Adams, 5 USCMA 563, 18 CMR 187, Chief Judge Quinn, writing for a unanimous Court, pointed out that the basis of self-defense is necessity, quoted with approval and at length from Brown v United States, supra, then went on to state:

". . . In United States v Troglin, 3 USCMA 385, 12 CMR 141, we elaborated on the Brown case, and pointed out that the necessity depends upon the facts and circumstances presented by the evidence, 'of which the possibility of retreat is *only a part.*' Ibid, page 391. The factual situation may indicate that the accused was 'foreclosed from retreating.' Ibid, page 393. In such a case, the accused's right to self-

defense is not lost because he does not pause to consider ways of escaping the imminent danger. Brown v United States, supra. People v Turner, 385 Ill 344, 52 NE 2d 712. Here, there is substantial evidence from which the triers of fact could conclude that the danger to the accused was so great and so imminent as to justify his standing his ground." [Emphasis supplied.] [5 USCMA at page 571.]

From the foregoing, it should be apparent that the doctrine of "retreat to the wall" has no place in ■■■ ■ self-defense instructions. Especially, after *Adams*, it should be clear that the Supreme Court's decision in the *Brown* case states the appropriate rule. There is no categorical requirement of retreat. Rather, the opportunity to do so safely is only a single factor, to be considered by the triers of fact together with all the circumstances in evaluating the issue of self-defense. And those who read the Manual for Courts-Martial to impose an absolute and categorical requirement of retreat before one may, in defense, kill or resort to use of force likely to result in grievous bodily harm,[4] clearly misconstrue the rule.

Returning to the conflicting evidence concerning this incident, there can be little question but that the prosecution's version showed appellant's guilt. But that is not the critical inquiry, for appellant contended that the injured party —known to be a fighter of some prowess —was the aggressor and had knocked him down, got astride him, and pounded his head against the cement floor. His testimony continued, in substance:

"I couldn't get up. I kept telling him to let me up, and this guy was still after my fly. I was kicking. I couldn't do too much at one time. Two people was on me. When I kicked I'm pretty sure I kicked him, and then this Bernardoni, I told him to get up and let me up. He said he'll bust my skull, 'you black bastard.' That's what he said. I couldn't get

him off me. He kept trying to bump my head on the floor.

"I got in my pocket. I pulled my knife out. I told him I had a knife. I tried to scare him. I couldn't scare him. He just kept coming. He bumped my head a couple of times. He said he was going to bust my skull. I was scared. This other man was on me and another man was blocking the door. I couldn't get out.

"When the strength was coming back a little, I kept wiggling. He got hold of the hand that held the knife, just jerking my hand. I felt it when it hit him. I felt it hit him on the head somewhere. I was scared. I was still trying to get away and then I kept saying, 'Go back.' He was going on top of me and I was yanking, trying to get loose. Pretty sure he was cut in the chest, on the body somewhere; and when I got almost free, I made a desperate yank to get away. This time he was turning around and I tried to get up as far as I could and I got up from the fight and broke my knife, and that's when the bouncers came in. I was glad to see 'em. I was scared."

Thus, it is quite clear an issue of self-defense was reasonably raised. Appellant's testimony, if credited, would permit a finding he was viciously assaulted, without provocation; by such means and in such manner as great bodily harm was likely and imminent; and that appellant was indeed, and legitimately, put in fear of such serious injury.

Under those circumstances and in light of the authorities discussed hereinbefore, we hold the ■■■ ■ charge given by the law officer was inadequate to present to the court-martial the appellant's theory of the case. The instruction in the case at bar contains the exact defect for which the conviction in *Brown* was reversed by the Supreme Court. For the same reason, the instruction herein is prejudicially erroneous, and requires that we overturn appellant's conviction. Brown v United States, supra; Josey v United States, supra; United States v Troglin, supra; United States v Adams, supra.

---

[4] See Manual for Courts-Martial, United States, 1951, paragraphs 197*c* and 207*a*, at pages 352 and 371.

The decision of the board of review is reversed and the record is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN and Judge FERGUSON concur.