UNITED STATES, Appellee

v

MORRIS J. SHEEKS, Staff Sergeant, U. S. Marine Corps, Appellant

16 USCMA 430, 37 CMR 50

*Lieutenant Warren K. Morgens,* USNR, argued the cause for Appellant, Accused.

*Lieutenant Jean E. Van Slate,* USN, argued the cause for Appellee, United States. With him on the brief was *Colonel J. E. Hanthorn,* USMC.

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Marine Corps Supply Center, Barstow, California, by its Commanding General, the accused was found guilty of falsely making, with intent to defraud, four checks, in violation of Uniform Code of Military Justice, Article 123, 10 USC § 923. He was sentenced to bad-conduct discharge, confinement at hard labor for two years, and reduction to the grade of E–1. The convening authority reduced the findings of guilty of one count to attempted forgery; approved those relating to the other three counts; and, reassessing the sentence, reduced the confinement imposed to one year. The board of review affirmed the findings approved below and only so much of the sentence as provided for bad-conduct discharge, confinement at hard labor for nine months, and the adjudged reduction.[1] We granted accused's petition for review upon issues inquiring whether the court-martial erred in overruling the law officer's granting of a motion for a finding of not guilty as to specification 1 of Charge I, and whether the law officer erred in denying a requested defense instruction regarding intent to deceive.

**I**

During the period in question, the accused was manager of the Yermo Branch Post Exchange. His assistant was Lance Corporal Cordova. On several occasions, accused sought Cordova's relief for inefficiency. No action, however, was taken, until November 8, 1965. On October 1, 1965, Gunnery Sergeant Pettengill, Acting Assistant Exchange Officer, proceeded to Yermo Branch and counted its change fund. It should have contained $7,500.00. Pettengill discovered it to be short $268.28, and informed Sheeks and Cordova of the fact, adding that it would be up to them to make it up. Sheeks became angry, pointed out that he had made up a hundred dollar shortage previously, and "wasn't going to put it all back . . . this time." Pettengill "mentioned that they would have to replace it, . . . left the area and let those two discuss it." He did not report the matter as he did not want "the boys to get into trouble." Thereafter, he did not check to see if the shortage had been made up, although he received daily cash reports from Yermo Branch, indicating a proper balance on hand. Sheeks and Cordova "were to work it out." Sheeks "was directed to make the shortage up as best he could within his judgment and so on."

Following Pettengill's departure, accused and Cordova discussed the shortage, possible reasons therefor, and how it might best be made up. No real conclusion was, or has ever

---

[1] Following our grant of review, the Secretary of the Navy, as a matter of clemency, remitted the unexecuted portion of the confinement, probationally suspended the bad-conduct discharge for twelve months, and restored accused to duty in pay grade E–4.

been, reached as to why the funds were missing, but all apparently concede no criminal misappropriation occurred. The closest one can come to a solution of the mystery on this record is to accept Cordova's statement of his belief that it occurred inadvertently during the cashing of various patrons' checks.

In any event, the two men agreed to repay approximately $130.00 each to the fund. In the meantime, Sheeks would conceal the loss by placing fictitious checks in the change fund. He also assisted Cordova in obtaining off-duty employment so that the latter would be financially able to satisfy the liability which he had assumed. While Cordova was aware of the device which Sheeks was using to conceal the loss, he at no time specifically authorized him to sign his, Cordova's, name to any check and did not participate in their making.

Accused made out four or more checks in varying amounts, reflecting the total shortage. To those with which we are here concerned, he signed the names "Betty L. Sheeks," "Lawrence J. Pearce," and "Greg Cordova," the last mentioned appellation being made by printing signatures on two of the instruments. These were placed with the funds. On one occasion, Cordova repaid $20.00 of the loss. On another, he saw the accused replace a check with cash and destroy the check.

On November 17, 1965, Chief Warrant Officer Lambert, the Exchange Officer, accompanied by an exchange area auditor and agents of the Criminal Investigations Detachment, conducted a surprise audit and inventory of Yermo Branch Exchange. The only discrepancy he found were the four checks in the change fund. Assuming them to have been good, accused's accounts were in balance. Sheeks was nevertheless relieved as manager. Mr. Lambert picked the checks up, gave the new manager a receipt for them, and, on the following day, negotiated them to the bank on which they were drawn. He did this, as he "considered them good." Prior to their negotiation, however, he called the bank and requested it to inform him if the checks were to be returned. In addition, he was visited by Corporal Lawrence J. Pearce, who examined the check purporting to bear his signature, and told him "it wasn't my check."

The checks were subsequently returned, as neither Cordova nor Pearce had accounts in the bank. Mrs. Betty L. Sheeks had an account, but the signature on this check appeared irregular and did not match that on file in the bank. Hence, it, too, was returned.

In addition to the foregoing, the accused made voluntary pretrial statements in which he admitted executing the instruments in question to conceal the shortage in funds until he and Cordova could make it up. He considered Cordova responsible for the shortage, as the funds had been in balance prior to the latter's sole operation of the Branch on an occasion just prior to its discovery. The checks were not intended to be negotiated.

## II

The first issue before us inquires into the correctness of the court-martial's action in overruling the law officer's granting of a motion for a finding of not guilty as to specification 1 of Charge I. This count alleges the false making by the accused of a check upon the account of Betty L. Sheeks.

The motion was granted on the basis there was no showing Betty L. Sheeks had not authorized the accused to make the check, she being his wife. A member of the court objected to the ruling and, in closed session, the court denied the motion. Basically, the question presented is whether the evidence is legally sufficient to support the ensuing findings of guilty regarding this count.

Before us, the Government urges that the record fails to establish Betty L. Sheeks was the accused's wife and, hence, there was no need to show lack of authority to make a check upon her bank account. In fact, the record reflects he was married and that his wife had a bank account. Moreover,

upon a court member raising that question in connection with the defense motion, it appears the parties to the trial adopted that view of the proof.[2]

In consequence, it was clearly incumbent upon the Government to produce some evidence tending to establish that Betty L. Sheeks had not authorized accused to make the check in question. The precise question was presented to this Court in United States v McFerrin, 11 USCMA 31, 28 CMR 255. There, the accused endorsed an allotment check, but no showing was made as to whether his wife, the payee, had authorized him to do so. Distinguishing United States v Manuel, 3 USCMA 739, 14 CMR 157, we reversed, declaring, at page 35:

". . . Forgery may not be inferred merely from the fact that a husband signs his spouse's name to a check. Neither may intent to defraud be presumed from that act. In resolving this issue, we need not go so far as to hold that either spouse is presumed to have the authority to sign the other's name to a document. All we need to do in regard to this offense is take the position that the signing of a wife's name to a negotiable instrument shows neither authority nor lack of authority. It was incumbent upon the Government to show the probability that the accused did not have the authority to sign his wife's name on the instrument in question and this record is devoid of the slightest suggestion that he was not authorized to negotiate the check in the manner he did."

Our holding in McFerrin, supra, is dispositive here, for, in like manner, this record is "devoid of the slightest suggestion that . . . [the accused] was not authorized to negotiate the check in the manner he did." Id., at page 35. All the United States presented was evidence that accused made the check and that, upon negotiation, it was subsequently returned for an irregular signature, i.e., it had not been made by his wife. We find no distinction between the facts here proven and those shown in our prior decision. In consequence, we necessarily conclude the evidence is legally insufficient to establish accused's guilt as to specification 1 of Charge I and that the court-martial erred, therefore, in denying the defense motion for a finding of not guilty with respect thereto. See also United States v Wooldridge, 10 USCMA 510, 28 CMR 76.

III

The second issue before us involves denial of certain defense requested instructions concerning an intent to deceive. Following the court's denial of the motion for a finding of not guilty, an out-of-court hearing was held for the purpose of discussing the necessary advice. The law officer outlined that which he intended to deliver to the court, including his definition of an intent to defraud, as a requisite element of the offenses charged. Defense counsel then sought inclusion of a definition of an intent to deceive, submitting such to the law officer in writing, and declared he was motivated to do so "because part of my case revolves around the intent to defraud and the distinction between that and intent to deceive, so I would request that it be given so that I — the court can properly be apprised of the distinction between these two intents." The law officer refused to give the requested instruction and did not in any other manner communicate the defense theory to the court-martial. Rather, insofar as is pertinent here, he limited himself to an outline of the elements of forgery, with a definition of the intent to defraud.

As recently as United States v Sitren, 16 USCMA 321, 36 CMR 477, this Court pointed out, at page 322:

"An accused is entitled to have presented instructions relating to

---

[2] In fact, Mrs. Betty L. Sheeks testified, as his wife, on behalf of the accused in mitigation and extenuation, although she was not called as a defense witness on the merits of the case.

any defense theory for which there is evidence in the record."

The following cases are authority for the same proposition, to which we have repeatedly drawn the ■■■■■■ ■ attention of trial personnel. United States v Amie, 7 USCMA 514, 22 CMR 304; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Mathis, 15 USCMA 130, 35 CMR 102; United States v Bellamy, 15 USCMA 617, 36 CMR 115. The matter was cogently described by Judge Kilday for the Court in United States v Smith, supra, when he declared, at page 474:

". . . What is contemplated is the affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them."

We reiterate our adherence to these precedents and reaffirm the necessity for the law officer to furnish to the members of the court explicit legal guidance on the theories of the respective parties as to the guilt or innocence of the accused, for which there is any basis in the evidence presented. United States v Sitren, supra. To the court members alone is confided the duty of sifting the proof in order to find the facts. This they cannot do either accurately or well unless their minds are illumined by a clear exposition of the governing legal principles. As we said in United States v Smith, supra, at page 474:

". . . A liberal application of this approach will avoid the possible pitfalls that may attend instructing on barren and abstract legal principles in a vacuum. In any case, it surely benefits both parties to a proceeding, and obviously enhances the quest for truth and justice in a truly enlightened atmosphere."

The Government does not deny the applicability of this well-settled concept to the defense counsel's request for a submission of the accused's theory of the case to the triers of fact. Instead, it urges upon us the contention that no foundation for the defense theory exists in the record and, indeed, an intent to defraud is overwhelmingly established by the evidence. We reject such interpretation of the proof and find the evidence clearly supported the theory embodied in the instructional guidance sought by defense counsel at the trial.

It may be assumed that the accused falsely made two checks in Cordova's name and one in that of ■■■■■■ ■ Pearce, for the amounts stated in the specifications. The essence, however, of the offense of forgery is that they be so made with intent to defraud. United States v Ebarb, 12 USCMA 715, 31 CMR 301; United States v Pelletier, 15 USCMA 654, 36 CMR 152; United States v Caudill, 16 USCMA 197, 36 CMR 353. And that state of mind, as applied to forgery, involves a purpose or design to deprive a person of property or something of value by trick, deceit, chicanery, or overreaching. United States v Leach, 7 USCMA 388, 22 CMR 178; Black's Law Dictionary, 4th ed, page 511. It normally refers to the intent of "wronging one in his property rights by dishonest methods or schemes." Hammerschmidt v United States, 265 US 182, 188, 68 L ed 968, 44 S Ct 511 (1924). Under Code, supra, Article 123, it is not sufficient that the accused intends deceptively to impair or impede a governmental function, although such may be enough to make out the requisite fraudulent state of mind under various sections of Title 18, United States Code. United States v Addye, 7 USCMA 643, 23 CMR 107; Pina v United States, 165 F2d 890 (CA 9th Cir) (1948); Tacoronte v United States, 323 F2d 772 (CA 10th Cir) (1963).

Moreover, an intent to deceive is not sufficient to establish an intent to defraud. United States v ■■■■■■ ■ Wilson, 13 USCMA 670, 33 CMR 202; United States v Wade, 14 USCMA 507, 34 CMR 287. Stated differently, false making of an instrument of apparent legal efficacy, with the intent to deceive, does not make out a violation of Code, supra, Article 123, although the intended

deception may circumstantially cast light on the ultimate purpose of the accused's acts.

Turning, then, to the case before us, we find defense counsel quite accurately delineated to the ▮▮ law officer the distinction between the Government's theory that accused, by his false making of the checks, intended to defraud, and his own theory that they were intended deceptively to cause the change fund to be in balance until the shortage could be made up. And, contrary to the Government's assertion here, the evidence tends to support rather than to refute the accused's case.

First, there is not the slightest hint in this record that either accused or Cordova was guilty of any criminal misappropriation of the missing funds. Rather, it appears to have been an honest shortage, commonly found in extensive commercial transactions, and what little proof on the point exists points to Cordova, rather than Sheeks, as the moving party in connection therewith. True, the checks were falsely made, but, as accused was the fund custodian, they were to remain under his control, and the testimony makes it clear they were not to be negotiated, but were to be used to balance the "cash" on hand. Moreover, while they were in fact sent to the bank for payment by Mr. Lambert, the *bona fides* of that transaction is seriously impeached by the fact he conducted his surprise audit, accompanied by criminal investigators; was told by Pearce that one of the checks was false before depositing them for payment; and negotiated them with instructions to the bank to report immediately if they were not valid instruments. Hence, one is inclined to question whether Lambert, as the Exchange Officer, was not fully aware of the circumstances at least when he seized and forwarded the checks. At the same time, there is no doubt that his Assistant was cognizant of the shortage and, in his own words, left it to the accused's judgment as to how it was to be handled.

Be that as it may, we are not required to judge the instructional request on the basis of the sufficiency of the evidence to establish guilt. United States v Sitren, supra; United States v Moore, 16 USCMA 375, 36 CMR 531. We find a substantial basis for concluding the court-martial could have found the accused intended only to conceal an innocent shortage in the change fund until it could be made up. Given this formulation, the accused was entitled to have his theory of the case submitted to the court, bottomed as it was on the evidence of no more than a intent to deceive. United States v Smith, supra. That is all he sought by his requested instructions, and the failure to grant them or otherwise to present his theory fairly to the members was, under the circumstances presented, prejudicially erroneous.

Finally, out of an abundance of caution, we point out that nothing we hold herein is in the least at odds with United States v Davis, 12 USCMA 576, 31 CMR 162, on which the Government relies here. In that case, we dealt only with the question of legal sufficiency of the evidence to prove an intent to defraud when the accused was shown to have forged a receipt indicating payment of his obligation in full in order to defer remittance to his creditor of the amount due until a future occasion. As we there found, an intent to defraud exists under such facts, for the debtor deprives his creditor of payment when due. In the case before us, however, we deal not with legal sufficiency but with whether an issue was presented by the evidence below. In any event, the cases involve different concepts, and we find no conflict between *Davis*, supra, and what we now hold on the facts presented here.

Left for consideration is the question of the disposition of the case. As we have stated, reversible error is present. In addition, the evidence is insufficient in law to support the findings of guilty as to specification 1 of Charge I. Normally, then, we would dismiss that count and order a rehearing as to the remainder. In the exercise of our discretion, however, it is also open to us to dismiss all charges

435

and specifications in an appropriate case. Here, the accused has served his sentence to confinement and has been restored to duty on probation, albeit in a reduced grade. The evidence of his guilt is equivocal, to say the least, and, under the circumstances, we deem it just not to require him to undergo the further harassment of a rehearing. We so order.

The findings of guilty are set aside, and the charges and specifications are ordered dismissed.

Chief Judge QUINN and Judge KILDAY concur.