UNITED STATES, Appellee

v

JOHN R. BRADSHAW, Airman First Class,
U. S. Air Force, Appellant

15 USCMA 146, 35 CMR 118

No. 17,731

November 27, 1964

*Major Milton E. Kosa* argued the cause for Appellant, Accused. With him on the brief were *Colonel Robert O. Rollman, Colonel Daniel E. Henderson, Jr.,* and *Major Hugh J. Dolan.*

*Lieutenant Colonel Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Tried by a general court-martial convened by the Commander, 73d Air Division (ADC), at Tyndall Air Force Base, Florida, the accused was found guilty of violation of a lawful general regulation and bigamy, contrary to Uniform Code of Military Justice, Articles 92 and 134, 10 USC §§ 892, 934, respectively. He was sentenced to bad-conduct discharge, forfeiture of $46.00 per month for six months, confinement at hard labor for six months, and reduction. The convening authority approved the sentence. The board of review set aside the findings of guilty relating to the violation of the lawful general regulation and reassessed the sentence, approving only so much thereof as provided for the adjudged punitive discharge, confinement at hard labor for five months, forfeiture of the stated amount per month for a like period, and reduction. We granted ac-

cused's petition for review on the specified issue that:

"THE LAW OFFICER ERRED WHEN HE INSTRUCTED THE COURT 'YOU ARE INSTRUCTED THAT THIS ANNULMENT SHOULD HAVE NO BEARING IN THIS CASE, AS FAR AS ARRIVING AT A DECISION ON THIS SPECIFICATION.'"

The evidence establishes that the accused was married to Hughie Jane Bradshaw on April 23, 1960. While children resulted of this union, it was apparently stormy and occasionally interrupted by separations and filing of suit for divorce. Reconciliations were effected, however, and no divorce action was ever successfully maintained. Mrs. Bradshaw nevertheless did not see her husband from July 1961 until the trial, although she corresponded with him. She did not write him after February 1963, and at no time did she inform him that she had obtained a divorce.

On July 2, 1963, accused married Melinda Ellen Carroll. Appearing on his own behalf, accused testified that he married Miss Carroll in the belief that his wife had obtained a divorce from him. The basis for this conclusion on his part were letters which he had received from her in February and May 1963. In the first, she allegedly informed him she had instituted the necessary proceedings and, in his reply, he unsuccessfully sought her attorney's address in order that he might obtain the "papers" in the case. In May 1963, Mrs. Bradshaw again wrote him and advised him they were divorced. He wrote back and asked for a copy of the decree but heard nothing further from her. When, after marrying again, he found he was not divorced, he promptly went to a civilian attorney, arranged to have his second marriage annulled, "and changed all necessary papers, because I realized I had made a mistake and didn't know what to do. This was a big shock to me." An authenticated copy of the decree of annulment of his marriage to Melinda Carroll was duly received in evidence on behalf of the defense.

In support of accused's testimony, Airman Philip W. Abrams declared he had seen and read two letters written to the accused, purportedly by the latter's wife. The first, which he saw in February 1963, indicated she was "taking actions for a divorce." The second, which he read about May 1, 1963, "said she had obtained a divorce and she wanted nothing more to do with Bradshaw." He also saw a letter which accused wrote his wife in May, in which he "asked where she had obtained the divorce, when, and stated that he wanted a copy of the decree of divorce, and if there was anything he had to pay for the divorce—what the support would be."

Based upon the foregoing evidence, the law officer properly advised the members of the court that an honest and reasonable belief on the part of Airman Bradshaw that he was divorced when he married Miss Carroll would prohibit his conviction of bigamy, even though he was mistaken in that belief. He further required the court to exclude the possibility of such honest and reasonable belief beyond a reasonable doubt in order to reach a finding of guilty as to this charge. At the outset of his instructions regarding this principle, however, the law officer also declared:

"Now, there was evidence introduced that the second marriage, or the marriage to Melinda Ellen Carroll, was annulled; however, this evidence showed that the annulment took place after the alleged bigamous marriage. You are instructed that this annulment should have no bearing in this case, as far as arriving at a decision on this specification."

Upon the conclusion of the law officer's instructions, a colloquy occurred concerning whether prosecution and defense exhibits should be permitted to remain with the court during its deliberations. As it ended, the following exchange between the law officer and the president took place:

"PRES: Then the court requests if Defense Exhibit B, the Decree of Annulment, should also be denied the court in its deliberation?

"LO: No sir, it can stay. My instruction on that decree of annulment

was that it was after the effective date of the alleged crime of bigamy—that's the reason you should not consider it—by date alone; for that reason."

Thereafter, as noted above, the accused was found guilty of bigamously marrying Melinda Ellen Carroll, from which verdict this appeal has been duly prosecuted.

Appellate defense counsel, pointing to the fact that whether accused honestly and reasonably believed he was free to remarry had been placed in issue by the evidence, argue that his prompt action to obtain annulment of such marriage upon learning he had not been divorced by Mrs. Bradshaw tended to support his claim of acting innocently. They urge further that the law officer's instructions regarding such annulment had the effect of eliminating it from the court's deliberations and thus seriously undercut his defense of honest and reasonable mistake.

The Government contends, however, that the instruction had no such effect and was properly limited to eliminating from the court's mind the possible consequences of a decree of annulment which was obtained long after the allegedly bigamous marriage had been contracted. It construes the advice to have nothing to do with the court's consideration of accused's testimony that, upon discovering the impediment to his later union, he took prompt steps to secure its judicial dissolution.

At the outset, we note our disagreement with the Government's construction of the law officer's instructions. Undoubtedly, annulment of a bigamous marriage is immaterial to the general question of guilt of bigamy. Burks v State, 50 Tex Crim 47, 94 SW 1040 (1906); People v Spitzer, 57 Cal App 593, 208 Pac 181 (1922). Perhaps that is the concept which the law officer intended to convey to the court, but the scope of his direction was much broader. He instructed the members to disregard all evidence that "the marriage to Melinda Ellen Carroll, was annulled" and informed them that, as "the annulment took place after the alleged

bigamous marriage . . . this annulment should have no bearing in this case, as far as arriving at a decision on this specification." It cannot be gainsaid that the effect of such advice, fairly construed, was to prohibit the court-martial from giving any consideration whatsoever to accused's testimony regarding his behavior upon learning of the lack of a divorce from Hughie Jane Bradshaw as well as the fact that his invalid marriage was thereafter dissolved. Cf. United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Acfalle, 12 USCMA 465, 31 CMR 51. The issue for decision, therefore, is narrowed to an inquiry whether it was proper so to preclude the fact finders from considering accused's reaction when he learned that Hughie Jane had not in fact divorced him, as he purported to believe she had done. We think it, too, should have been weighed in the balance.

While some controversy seems to have raged in the past over whether actions and declarations on the part of an accused subsequent to the alleged commission of a crime are admissible to demonstrate a consciousness of innocence on his part, it has been noted that such proof "seems not to have been doubted by Courts as having in itself evidential value." Wigmore, Evidence, 3d ed, § 174. Thus, in Herman v United States, 48 F2d 479 (CA 5th Cir) (1931), defendant, charged with violations of the National Prohibition Act, in support of his claim that liquor found on his premises was there without his consent, was permitted to show he had reported its presence to the sheriff's wife "as indicating a consciousness of innocence." Herman v United States, supra, at page 480. Cf. American Tobacco Co. v United States, 147 F2d 93, 120 (CA 6th Cir) (1944). And in United States v Bucur, 194 F2d 297 (CA 7th Cir) (1952), the Circuit Court of Appeals held it reversible error to refuse to allow a witness to testify that defendant, charged with conspiracy, had made statements to him inconsistent with his continued participation in the criminal agreement. It declared, at page 301:

"This testimony may be labeled

'self-serving' in the sense that it relates to the conduct and declarations of the defendant. As observed in United States v Matot, 2 Cir, 146 F2d 197, generally all evidence submitted for a defendant is self-serving. But the government properly asserts that, in order to escape liability, an accused, once shown to have been a member of a conspiracy, must assume the burden of proving a good faith severance from the conspiracy when he ascertains its illegal character. By his plea, defendant denied knowledge of the fact that the vehicles were stolen. Thereafter he was confronted with substantial affirmative proof to the contrary. In this situation, he had a right to attempt to meet and overcome this proof against him by evidence tending to establish his good faith. To be compelled to meet this challenge without the benefit of testimony concerning his conduct and statements, following what he contends was his initial ascertainment of the illegal scheme, seems to us manifestly wrong. If testimony of this nature is excluded by the legalistic tag of 'self-serving,' an anomalous situation is presented where the accused is faced with the need to bolster his claim of innocence but is deprived of the most logical means of doing so."

As in United States v Bucur, supra, the effect of the law officer's instruction here was to deprive the accused of the effect of his testimony concerning the initiation of the annulment proceedings on the behalf of his putative wife upon learning that he had not, in fact, been divorced by his legal spouse. The value of evidence regarding efforts to obtain an annulment as indicative of the existence of an honest mistake on the part of an alleged bigamist has been squarely and succinctly described in the following terms:

" . . . The letter [of the defendant] showed that as soon as he learned that he had not obtained a divorce in Oklahoma, he sought to have the marriage with Roberta Belle Young annulled. It tended to show that he entered into the second marriage with the honest and sincere belief that he had a legal right to do so. That upon receipt of information to the contrary, he immediately did what he could to correct the error. In short, the letter brought out facts which, if the jury had believed them, might have been a potent factor in exonerating him from the charge for which he was on trial." [McDonald v State, 138 Tex Crim 510, 136 SW2d 816 (1940).]

Rather than advising the court members that the annulment proceedings were wholly irrelevant to the question of accused's guilt or innocence of bigamy, the law officer might properly have informed it that Bradshaw's connection therewith should be considered as a factor in determining whether he had entered into the matrimonial state with Miss Carroll, honestly and reasonably believing he had been divorced by Hughie Jane Bradshaw. Cast into the scales and considered with the other testimony of accused and Airman Abrams regarding the letters allegedly received from Mrs. Bradshaw, the fact finders might have found a reasonable doubt to exist concerning his guilt, such action on his part being "a potent factor in exonerating him from the charge for which he was on trial." McDonald v State, supra. The contrary advice, excluding all consideration of this facet of the proof by the court, creates a fair risk that it was misled in its deliberations and was, therefore, prejudicially erroneous. United States v Bucur, supra. Reversal is accordingly necessitated.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

After a previous marriage terminated by divorce, the accused married Hughie Jane in April 1960. Marital discord developed early; and in July 1961, they separated on a permanent basis. Thereafter, they wrote irregularly to each other about the possibility of divorce

149

and arrangements for the support of their two children. The conflict in the evidence as to whether Hughie Jane wrote the accused she had obtained a divorce is set out in the principal opinion. Suffice it to add here, the accused contended that, after receiving the May letter, he "figured" he was divorced. He could not produce this letter because it had been lost in the confusion of deactivation of the installation at which he was then stationed. On July 2, 1963, he married Melinda Ellen Carroll in the State of Texas. Except for the letter asking for a copy of the decree, he made no other inquiry about the divorce; nevertheless, he would not have entered into the marriage with Melinda Ellen if he "didn't think . . . [he] was divorced" at the time.

Charges were filed against the accused in August 1963 for several violations of the Uniform Code, including the offense of which he stands convicted. On September 26, 1963, a Texas court awarded a decree of annulment to Melinda Ellen, not the accused, dissolving the marriage between them on the ground that she had entered into it "under the mistaken understanding that . . . [the accused] was a single man and not a married man as the facts appear." The accused testified that on learning he was not divorced from Hughie Jane (at a time not specified), he "[r]ight away . . . went to a civilian lawyer and put in for an annulment and changed all necessary papers, because . . . [he] realized . . . [he] had made a mistake." The decree was not mentioned by either counsel in summation, although both emphasized the conflict between Hughie Jane's testimony and the accused's as to the contents of her last letter to him. However, after instructing on the elements of the offense of bigamy, the law officer referred to the annulment. His remarks are as follows:

"Now, there was evidence introduced that the second marriage, or the marriage to Melinda Ellen Carroll, was annulled; however, this evidence showed that the annulment took place after the alleged bigamous marriage. You are instructed that this annulment should have no bearing in this case, as far as arriving at a decision on this specification."

Immediately after the quoted instruction, the law officer discussed the legal effect of the evidence of the accused's belief that he was divorced from Hughie Jane when he married Melinda Ellen. He instructed the court-martial that an honest and reasonable belief that the first marriage was terminated, constituted a defense to the charge of bigamy. See United States v McCluskey, 6 USCMA 545, 20 CMR 261. He concluded with the reminder that, under the proof, the accused must be acquitted, unless the court was satisfied beyond a reasonable doubt that at the time of the second marriage, "the accused did not honestly and reasonably believe that his prior marriage to Hughie Jane Bradshaw had ceased to exist." Defense counsel offered no objection to any part of the instructions. Before the court retired into closed session to deliberate on the findings, the president asked whether the court could take the prosecution exhibits with it into the closed session. The law officer indicated that both prosecution and defense exhibits could be taken. The president then asked whether Defense Exhibit B, the Decree of Annulment, would be "denied" to it. The law officer responded as indicated in the principal opinion.

Appellate defense counsel argue that the annulment shows the accused "conducted himself as human experience indicates an innocent man would conduct himself upon learning of his bigamous marriage" and this conduct substantially bolstered his defense of honest and reasonable mistake. The Government advances several counter-arguments. Most stressed is the contention that the decree of annulment shows it was obtained by Melinda Ellen, not the accused; consequently, it could have no probative value as a post-offense act by the accused tending to show his state of mind at the time of the commission of the offense. The logic of the argument seems inescapable, especially if it appeared that the petition, upon which the decree was granted, alleged or im-

150

plied that Melinda's "mistaken understanding" of the accused's marital status was induced by false representations by him. For purposes of this appeal, however, I am willing to assume that the form of the action, with Melinda Ellen as plaintiff, was merely a convenient way to initiate the judicial proceeding. Nevertheless, in my opinion, neither the assumption nor the argument on the probative effect of the annulment can help the accused.

As I read the law officer's comments, they amount to nothing more than an instruction that the formal annulment of the second marriage had no legal significance as to the elements of the offense of bigamy. What the law officer did was make clear to the court members that, while the marriage between the accused and Melinda Ellen on July 2 was "set aside and held for nought," as provided in the decree admitted in evidence, and which they were allowed to take with them into the closed session, the annulment had no "bearing" on whether the accused married Melinda Ellen as charged. The evidentiary rulings permitted the court members to consider the annulment as evidence of the accused's belief that he was divorced, but the instructions pointed out that the annulment did not extinguish the marriage to Melinda Ellen, and thereby eliminate the basis for the bigamy charge. This instruction is correct. Every bigamous marriage is void; and the procurement of a judicial declaration of its nullity is no defense to a charge of bigamy. Burks v State, 50 Tex Crim 47, 94 SW 1040 (1906). That this was the intention of the law officer and the understanding of counsel and the court-martial is emphasized by two circumstances. First, the initial comments on the annulment were made immediately after the enumeration of the elements of the offense; and these in turn were immediately followed by a full discussion of the accused's defense that he believed he was divorced. Secondly, the decree of annulment was admitted into evidence, and the court was permitted to take it into the closed session deliberations. Although the accused now argues oppositely, the comments on the

effect of the annulment were entirely consistent with the evidentiary rulings.

Putting aside my reading of the record of trial and accepting the accused's interpretation of the instructions, I am not persuaded they were prejudicial. Under the accused's argument, the fact the second marriage was annulled was meaningful, only so far as it tended to suggest that the accused believed he was divorced from Hughie Jane. He testified he was so informed in a letter received from her in May 1963. He also testified he made no effort to ascertain whether he was actually divorced. The accused's wife testified she had never indicated in any letter to him that she divorced him. The question of the accused's belief thus focused exclusively on the content of the letters which passed between him and his wife. Evidence of corroboration of his version of the letters would, of course, help tip the scale in his favor. Appellate defense counsel maintain that evidence of the annulment decree would have materially tipped the scale in the accused's favor. If that had constituted the only corroboration in the case, there might be merit in the argument. However, the accused offered corroborative evidence which was much more direct and infinitely more dramatic than that of the annulment decree. He presented the testimony of a witness who said he saw the letters. That witness testified that the content of the letters was as represented by the accused. If the court-martial believed the accused and his witness, the letter alone would have established an adequate basis for his contention that he believed he was divorced. From that point on, the court-martial would have had to consider, as defense counsel argued at trial, whether the accused had then and there "information which would indicate to a reasonable man that his prior marriage had ceased to exist." On the other hand, if the court-martial disbelieved the accused and his witness, as to the content of the letters, the defense would immediately collapse. If the court-martial disbelieved the corroborative evidence presented by Abrams' testimony, would it have been influenced in the accused's favor by the

**151**

possible inference of a consciousness of innocence which could be drawn from the annulment? I think not. I conclude, therefore, that even if the instruction was erroneous, it was not prejudicial to the accused.

I would affirm the decision of the board of review.