UNITED STATES, Appellee

v

RUDOLPH L. BURSE, Sergeant, U. S. Army, Appellant

16 USCMA 62, 36 CMR 218

No. 18,836

March 4, 1966

*Captain James A. Buttry* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*Captain Walter L. Harvey* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain Charles M. Pallesen, Jr.*

## Opinion of the Court

FERGUSON, Judge:

A general court-martial convened at Fort Bragg, North Carolina, by the Commanding General, 82d Airborne Division, convicted the accused of three specifications of aggravated assault, in violation of Uniform Code of Military Justice, Article 128, 10 USC § 928, and sentenced him to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for five years. Intermediate appellate authorities have affirmed, and we granted accused's petition for review on issues dealing with the sufficiency of the law officer's instructions on self-defense and a controversy which arose between him and the president of the court during the course of the trial. These matters will be more fully treated below.

### I

There is no need to set forth the evidence at length, as there is no controversy here, nor was there below, over whether self-defense was placed in issue. Briefly stated, the Government's proof tends to show the accused attempted to get a Sergeant Cooley to leave accused's automobile and desist harassing a young lady who was in the car. According to Cooley, as he was complying with accused's request, Burse shot him in the leg with a small caliber revolver.

According to Burse and others who witnessed the incident, the shooting occurred after Cooley had left the car and only because he was advancing upon Burse with a razor blade in his hand. Cooley had a reputation for cutting people, and investigating officers found a razor blade at the scene.

The other incident occurred several months later in the Noncommissioned Officers' Club. The victims, Sergeants Fields and Easley, became involved in a brief altercation in the Club latrine with one of the accused's companions. Accused entered and broke it up. According to Fields and Easley, they left the Club and, while waiting on the parking lot for a friend, accused ambushed them with a sawed-off shotgun, resulting in serious injuries to their legs.

Once more, the evidence is in sharp conflict. Accused and other witnesses testified they were waylaid on the parking lot by Fields and Easley, in a continuation of the earlier incident. Fields was armed with a pistol, slapped one of accused's companions, and advanced on accused, with Easley importuning him to shoot Burse. Accused obtained his shotgun from his car, pointed it in the air, and pulled the trigger. As the firing pin clicked on an empty chamber, the eventual victims continued their advance upon

him with the pistol. Burse promptly obtained a shell from his car, loaded the weapon, and fired it toward the feet of the two sergeants. Their injuries resulted, and they fled into the Club. At all pertinent times, according to Burse and the other defense witnesses, their exit from the parking lot was barred by Easley's automobile.

There was no evidence that Easley and Fields ever attempted to open fire on the accused; both denied being armed on the evening in question; and no pistol was found in their possession after the incident.

## II

Generally speaking, the law officer's instructions commendably embodied the theories of both parties to the trial concerning the law of self-defense and the grounds for its exercise. See United States v Jackson, 15 USCMA 603, 36 CMR 101, and United States v Vaughn, 15 USCMA 622, 36 CMR 120. As defense counsel point out, however, he nonetheless advised the court, among other things that, to entitle the accused to an acquittal, Burse must not only have honestly and reasonably believed he was in immediate and imminent danger of death or grievous bodily harm but it also must find "the evidence tends to show, that he was in . . . [such] danger." He also quite properly pointed out that the accused "was under no duty whatsoever to retreat," but conditioned the lack of need for retreat upon a finding "the accused *was in danger* of being shot . . . or being slashed." (Emphasis supplied.) Finally, he concluded with an admonition to the court that the availability of the right of self-defense to the accused was based upon a finding "he *had* to use a shotgun in the October incident or the pistol in the September incident" to save himself from immediate danger of grievous bodily harm or death. (Emphasis supplied.)

As appellate defense counsel urge, these references throughout the law officer's instructions to the need for a finding of real danger to the accused and actual necessity for his resort to deadly force predicate his right of self-defense upon the factual need for such force rather than upon its apparent need, that is to say, not upon his honest and reasonable apprehension that he was about to suffer death or grievous bodily harm at the hands of his alleged assailants. Such, however, is not the law, for the accused is entitled to meet an attack upon his person with that degree of force which is, to him, apparently, and on honest and reasonable grounds, necessary to save himself from death or grievous bodily harm. In short, he is entitled to act not alone on facts, but also on appearances, if such would cause fear to arise in a reasonable individual so circumstanced.

We have many times so held. United States v Jackson, United States v Vaughn, both supra. Thus, we said in United States v Gordon, 14 USCMA 314, 34 CMR 94, at page 321:

". . . [O]ne who 'in fact, and on reasonable grounds, fear(s) imminent death or serious injury,' is entitled to resort to deadly force in self-defense."

See also United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Black, 12 USCMA 571, 31 CMR 157; and United States v Ginn, 1 USCMA 453, 4 CMR 45.

So far as we can determine, the entitlement of an accused to act in self-defense on the basis of reasonable appearances seems well-nigh universal. 1 Wharton, Criminal Law and Procedure, § 349 (1957); Clark and Marshall, A Treatise on the Law of Crimes, 6th ed, § 7.03; Warren on Homicide, Perm ed, § 155; Acres v United States, 164 US 388, 41 L ed 481, 17 S Ct 91 (1896). Indeed, the Government does not contend otherwise, but argues that, as the law officer elsewhere set forth the proper standard in his instructions, they are,

as a whole, correct and could not, therefore, have misled the court-martial. This contention, however, must be rejected, for, ▪ where the advice sets forth two inconsistent standards, one correct and the other incorrect, its propriety cannot be measured as a whole. We simply have no way of determining which principle—that which is correct or that which is erroneous—the court members elected to follow. United States v Sanders, 14 USCMA 524, 34 CMR 304; United States v Holloway, 10 USCMA 595, 28 CMR 161; United States v Skonberg, 10 USCMA 57, 27 CMR 131; United States v Noe, 7 USCMA 408, 22 CMR 198.

Self-defense being in issue and the evidence in such a posture that there is a fair risk the erroneous advice may have misled the court in rejecting accused's defense, we find the instructions prejudicially incorrect. Reversal is, therefore, required.

### III

The foregoing matter serves to dispose of the case and normally would eliminate any need for discussion of the other assignments of error. But we cannot disregard an incident occurring at the trial which merits our sharpest disapproval and which might, of itself, lead to reversal for the failure of the law officer, *sua sponte*, to declare a mistrial, were it not for the fact that the defense counsel, offered that remedy, declined to invoke its aid and elected to proceed with the trial.

In the course of the examination of a character witness, an enlisted court member inquired whether any letters of indebtedness had been received concerning the accused. The following then transpired:

"LO: Just a minute, Sergeant. That's improper to go into that. That has not been brought out in any way, shape, or form. As I told you, gentlemen, once and I will tell you again you are not to ask any questions that have not been brought out on direct or cross. You cannot go into collateral issues.

"PRES: I object to the manner in which the court members are being spoken to (hitting his fist against the court table).

"LO: I'm sorry, Colonel B——, I have to be firm in matters of this nature.

"PRES: You have to be firm and be polite.

"LO: I am trying to be polite. There is an issue that has been brought out that is highly improper.

"PRES: If this continues, I will have to close the court.

"LO: You may do so if you wish. The comment of the first sergeant . . .

"PRES: We're not lawyers and we don't expect to be addressed and talked down to. Now, these people do not know and do not understand any more than myself the law. Now, we're not trying to get off; all you have to do is overrule us and say that it is not in line, but I'll be God-damned if I am going to be talked to like that. Let's continue.

"LO: The court at this time will take a ten minute recess. I desire to have an out-of-court hearing."

In the out-of-court hearing, the law officer proffered defense counsel an opportunity to have a mistrial declared. Counsel wished to consider the matter and court was reconvened. At this time, the president made the following statement:

"PRES: I would like to make a remark, if I may. I wish to withdraw the profanity at the end, but I wish to assure the accused and his counsel that my remarks were not directed at either they or the witnesses but rather what appeared to me the manner in which the law officer instructed a member of the court. I do not object to the substance of the instruction given by the law officer nor does it mean that I will not follow the law officer's instructions, nor has anything oc-

curred in court to influence me in any way whatsoever concerning my opinion in the case. I agree with the substance of the instruction—a very good instruction given by the law officer—I objected to what I thought was the tone and the manner."

Thereafter, court recessed and when it once more reconvened, defense counsel stated he did not desire to move for a mistrial. The case then continued in its ordinary course.

We have before been confronted with cases in which there was a seeming attempt to revert to practices antedating the Uniform Code of Military Justice. See United States v Guest, 3 USCMA 147, 11 CMR 147; United States v Duncan, 9 USCMA 465, 26 CMR 245; United States v Butler, 13 USCMA 260, 32 CMR 260. Fortunately, these instances have been rare, but, when one of the nature here presented arises, there is no doubt of the duty and responsibility of the law officer immediately to quell the lay members of the court, regardless of their rank and position, and enforce his rulings to the utmost. The law officer is the trial judge and, as such, presides over every aspect of the trial, except those which have been specifically retained to the court under the Code. See, generally, Code, supra, Article 51, 10 USC § 851, and United States v Brux, 15 USCMA 597, 36 CMR 95. Traditionally and under antecedent legislation, the president of the court was the central official in the trial, and the law member's rulings were made subject to the court's objection. Generally speaking, that no longer obtains and, as we said in *Duncan,* supra, at page 467, and repeated in *Butler,* supra, at page 264:

"'. . . It is long past the time when members of courts-martial should seek to use their official position or rank to argue with and belittle the rulings of law officers. They must accept the fact that the law officer is the judge of a military court and he rules on questions of law and other interlocutory questions. Members of courts are not

monitors of his rulings. Their duty is to determine the guilt or innocence of the accused, and they should not depart from that role. If factual situations are underdeveloped or unclear, they are entitled to ask clarifying questions. However, there are proper means by which this may be done and, except in those instances where the Code gives the court the right to overturn a law officer's rulings, court members must accept rulings of law from the "judge" and not become piqued at his decisions. Caustic comments neither add to the dignity of the court members nor the atmosphere of the courtroom drama.'"

We reiterate that statement here and point out that unbridled outbursts may well demonstrate such ▉▉▉▉ ▉ "lack of judiciousness as to deprive the court-martial of that judicial caliber demanded by the Code." United States v Lynch, 9 USCMA 523, 526, 26 CMR 303, 306. Even under the older system, profane rejection of legal rulings would be condemned by every right thinking officer and we specifically note the president's "apology" here extended only to his grossly improper invocation of the Deity. Under the present system, we wish to make it quite plain we will tolerate no interference by the court or any member thereof with the substance, form, or tone of the law officer's rulings. They are final and are to be treated as such. If the court evinces disagreement, as did the president here, the way is open to the law officer in a proper case to end the proceedings and provide for their retrial before another tribunal. Only in this manner can the integrity of his office be assured and the sort of judicious, fair, and impartial trial envisioned under the Uniform Code of Military Justice guaranteed to the accused and to the public, whose interests in military justice equally demand protection.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate

General of the Army. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

The remarks by the president of the court-martial were inappropriate. It is significant, however, that he did not disagree with the law officer's ruling or otherwise attempt to usurp the law officer's duties. Furthermore, he expressly disclaimed any bias against the accused and defense counsel. The record of trial, therefore, affirmatively demonstrates that the untoward outburst was not directed against, nor was it harmful to, the accused. Also, after apparently full consideration of the possible effects of the incident, defense counsel rejected the law officer's proffer of a mistrial. In these circumstances, the incident does not justify reversal of the findings of guilty. See United States v Talbott, 12 USCMA 446, 31 CMR 32.

As to the instructions, there is no point in my setting them out at length. Suffice it to say that, when they were proposed in an out-of-court hearing, defense counsel indicated they were eminently satisfactory to him. In my opinion, considered as a whole, the instructions did not mislead the court members to the accused's prejudice.

Each incident presented a simple, factual question. This point was emphasized by both trial counsel and defense counsel in their closing arguments. "The issue," summarized trial counsel, "is who is telling the truth? This much-assaulted accused or the people who were gunned down." Defense counsel phrased the matter somewhat differently. The "basic question" in the Sergeant Cooley incident, he said, was whether "Sergeant Cooley engaged in an assault on Sergeant Burse at the time Sergeant Burse shot him"; and in the Noncommissioned Officers' Club affair, "seven unimpeachable witnesses" testified "that there was a pistol in the hand of Sergeant Fields," when he and Sergeant Easley were in the parking lot where the shooting occurred. In the context of the evidence, the arguments of counsel, and the entire instructions, I am convinced that the court-martial was not misled, in its deliberations as to the accused's guilt or innocence, by any of the phrases carved out of the instructions by the majority. I would, therefore, affirm the decision of the board of review. United States v Lyons, 14 USCMA 67, 33 CMR 279.