### UNITED STATES, Appellee

v

### PATRICK CONDRON, Sergeant E–5, U. S. Army, Appellant

17 USCMA 367, 38 CMR 165

*Captain Kenneth J. Stuart* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker,* and *Major David J. Passamaneck.*

*Captain David K. Fromme* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major John F. Webb, Jr.*

## Opinion of the Court

KILDAY, Judge:

Appellant was arraigned before a general court-martial convened in the Republic of Vietnam charged with two specifications of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. To each, he entered a plea of not guilty. He was found guilty as charged as to one specification, while of the other he was found guilty of unpremeditated murder—a lesser included offense. He was sentenced to dishonorable discharge, total forfeitures, reduction to the lowest enlisted grade, and life imprisonment. The convening authority approved the sentence. A board of review in the office of the Judge Advocate General of the Army affirmed the findings of guilty and the sentence.

In the first of three granted issues assigned by the appellant in his petition for review, this Court is asked:

Whether the law officer erred in failing to instruct on self-defense as raised by the evidence.

Factual recitation from this transcript of trial depicts the following. On August 29, 1966, Privates First Class Patton and Judah occupied a troop tent at the Phu Lio Base Camp, Republic of Vietnam. On this day, they were visited by two Vietnamese camp workers. While the four looked at a picture album, the appellant entered the tent and picked up a rifle from his bunk. Inserting a clip and chambering a round, he walked past the Vietnamese apparently intending to leave. To an inquiry by Patton, accused stated he was going hunting. Judah expressed the hope Sergeant Condron would do his hunting in the jungle. To this the appellant replied that he could do his hunting right there, simultaneously pointing his rifle at the Vietnamese. When he lowered the weapon, one of the Vietnamese youths informed the accused that he was "no VC" and then sat back on the bunk. The accused in turn pivoted and shot one of the Vietnamese. Patton crawled out the bottom of the tent and ran to the orderly room as more shots were fired. Judah was ordered out of the tent. There is apparent agreement that two groups of shots were fired. Both Vietnamese died from multiple chest wounds.

Additional facts were supplied from the testimony of Specialist Bohocky. This witness heard the firing, ran toward the sound, and saw the appellant standing in a tent entrance. Asked what had happened, accused declared, " 'They jumped me.' " When taken to the orderly room, accused volunteered the comment, " 'They're dead, they're VC.' "

With the evidentiary presentation completed, instructional matters became the subject of discussion in an out-of-court hearing. Initially, defense counsel saw no issue of self-defense. Later events, however, reflect his change of mind. During a discourse on character instructions, the following colloquy emerged:

"LO: That's normally given only in cases where there is self defense in issue. There is no self defense

368

in issue here and the accused is not stating that these particular individuals did act toward him. I doubt if it would be proper to give this. I don't see what purpose it would be since there is no evidence that they did any act or took any action.

"DC: There is evidence in the statement of the accused to the witness that they jumped him.

"LO: That they what?

"DC: That they jumped him.

"LO: Yes, there is evidence that the accused is alleged to have said that 'They jumped me'. I will make that instruction. I am going to ask you again, do you see any basis for any instruction on self defense? Now the evidence indicates that the accused is alleged to have said 'They jumped me'. We have had some evidence put into the record as to the location of the weapons which would indicate that the weapons were a considerable distance from either of the victims. I'm not going to instruct on the question of self defense. Nothing at all about it. I can't see that it is in issue; it's just not here. Well, I believe that's everything we have covered then."

We are now met with Government counsel's argument that the evidence of record does not raise an issue of self-defense; there being nothing in these facts to which a jury might attach a degree of credence if it so desired. Moreover, counsel see the accused as an aggressor and, therefore, not one entitled to this defense. Lastly, it is averred that such an instruction was affirmatively waived by the defense at the trial level.

The recorded exchange between the law officer and defense counsel reflects neither a renouncement nor an abandonment of this defense theory. Indeed, the law officer's refusal to instruct, made concomitant with his inquiry as to the relevancy of such an instruction, rendered any evaluation by defense counsel a useless exercise permitting not even the semblance of a reply.

Furthermore, where the application

of such a doctrine removes a central issue of the case, we are most reluctant to impose waiver. United States v Ebarb, 12 USCMA 715, 31 CMR 301. In the absence of a clear and unquestioned showing of waiver, we are governed by the proposition that the basic responsibility for giving proper instructions rests upon the law officer. United States v Sitren, 16 USCMA 321, 36 CMR 477.

Self-defense is unmistakably raised by the evidence shown in this record. Contrary to the views expressed by appellate Government counsel and by the board of review, reasonableness, i.e., credibility, is a question reserved solely for the fact finders. We have consistently so held. Our most recent pronouncement on this subject is to be found in United States v Evans, 17 USCMA 238, 38 CMR 36, where, at page 242, we said:

"Thus, we have long held the test whether an offense is reasonably raised is whether the record contains some evidence to which the military jury may attach credit if it so desires. United States v Jones, 13 USCMA 635, 33 CMR 167; United States v Remele, 13 USCMA 617, 33 CMR 149; United States v Kuefler, 14 USCMA 136, 33 CMR 348. It matters not that the accused is the sole source of his contention. He certainly 'has the capacity to testify directly to the intent, knowledge, or other mens rea which fills out and characterizes his acts either as criminal or legally blameless.' United States v Remele, supra, at page 621. And the reasonable character of his testimony is 'for the determination of the court-martial, under proper instructions.' United States v Jones, supra, at page 640. As we said in United States v Kuefler, supra, at page 139:

'So also do trial judges and appellate bodies interfere with the function of the court members and deprive the accused of his right to a primary trial on the facts when the credibility of his claims is

found wanting in light of the strong case against him.' "

Any question as to the meaning and purpose of this seeming unambiguous expression should have been eradicated by the further articulation in this same case that "credibility of the evidence is not the test for instructional sufficiency. United States v Kuefler, supra." (Id., at page 243.) See also United States v Ebarb, supra; United States v Goins, 17 USCMA 132, 37 CMR 396; United States v Sheeks, 16 USCMA 430, 37 CMR 50; United States v Smith, 13 USCMA 471, 33 CMR 3. Doubtless, under the circumstances portrayed here, it was an error of reversible proportion for the law officer not to have given such appropriate and needed advice to the court-martial. United States v Evans and United States v Sitren, both supra.

The next issue to be considered is:

Whether the law officer erroneously instructed the court on the consideration of character evidence.

The law officer's instruction emphasizing good character reads:

". . . The defense in this case has introduced evidence as to the accused's good character. The law recognizes that a person of good character is not as likely to commit an offense as is a person of bad character. Evidence of the accused's good character therefore is admissible as tending to show that there is some doubt that the accused committed the offense charged. Considered and weighed alone or connected with the presumption of innocence and all the other evidence in the case, this evidence of the accused's good character may be sufficient to cause a reasonable doubt to remain as to his guilt and warrant an acquittal of the charge."

He continued by advising the court-martial:

". . . On the other hand, the inference of innocence to be drawn from such evidence may be more than *offset* by the prosecution's evidence of the *accused's character* or other evidence in the case tending to establish the accused's guilt. As members of the court the final determination as to the weight to be accorded this and all the other evidence in the case rests solely with you." [Emphasis supplied.]

In the eyes of Government counsel, error and prejudice do not exist. These instructions are considered a gratuity, neither party having offered character evidence in this case. Thus, the instructions given are said to relate to only a nonexistent inference of innocence based upon nonexistent evidence.

We are not persuaded by this rationale. The record shows apparent unanimity between trial counsel and the law officer to defense counsel's assertion that at least two witnesses gave testimony relative to appellant's good character. Indeed, the instruction was thereafter given unencumbered by objection.

The board of review strengthens our belief in this regard for they believe that good character was a matter in evidence. Thus, from their viewpoint, the second portion of the instruction was in error, though deemed nonprejudicial.

If the word "bad" is inserted between the words "accused's character," found in the second portion of the above-quoted instruction, it becomes substantially the same as the instruction given in the case of United States v Reloza, 16 USCMA 389, 37 CMR 9. With or without this addition, the implication in both is identical. Evidence that "offsets" good character is evidence that emphasizes bad character. With or without the missing word, both instructions are intended to, and most assuredly do, convey the same singular thought. It is the emphasized "offset" that gives explicit meaning to the instruction before us. We see, therefore, no substantial difference in effect between the instruction given here as compared to that given in United States v Reloza, supra. In light of our holding, this instruction must be considered misleading and preju-

dicially erroneous, just as it was in *Reloza*.

The third and final assignment of error is based upon the law officer's instruction on sentence wherein he noted that if the court adjudged life imprisonment it should include a dishonorable discharge and total forfeitures as a part of the sentence. It is urged by defense that this is prejudicial comment on the sentence.

Contrariwise, the Government argues, in part, that the balance of the instruction safely left the matter to the court's discretion. Where the truth lies, we need not decide for the entire problem may be obviated by a more certain and meaningful choice of language at the rehearing which, as we have noted, is required by the errors previously discussed. See *United States v Jones*, 10 USCMA 122, 27 CMR 196, and cases cited therein.

The findings of guilty and the sentence are set aside. The decision of the board of review is reversed and the record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

A remarkable transformation of the defense view of the evidence has been effected on appeal. At trial, defense counsel told the court-martial, in his opening argument, that the defense evidence would demonstrate the two killings perpetrated by the accused constituted only voluntary manslaughter because "done in the heat of sudden passion caused by adequate provocation." There wasn't a word about self-defense. Later, during discussion of proposed instructions, defense counsel three times indicated to the law officer that he did not see self-defense as an issue in the case. Now we are told the evidence really shows the Vietnamese boys were killed in self-defense, and that an instruction on self-defense should have been given by the law officer. The majority perceive support for the transformation in the evidence. I find none.

The evidence as to what transpired at the scene of the shooting is very brief. Private First Class John Gerald Patton and Private First Class Billie Aaron Judah were in a troop tent in the company base area looking at an album of photographs belonging to Judah. Two Vietnamese boys, who did the laundry for some members of the company, were also present. The boys were dressed in short-sleeve shirts and shorts. Nguyen Tan Trung was seated next to Patton on one bunk; and Tran Van Giau sat beside Judah on the adjoining bunk. They were "laughing and joking" as they examined various photographs in the album. Then the accused entered. He seemed troubled and bitter. He had recently recovered from a combat wound; and had just returned to the company from a period of rest and recreation. According to a psychiatrist who had examined him, the accused was "in emotional turmoil about going back to duty" in the field that night. The accused picked up his rifle, loaded it, and, contrary to camp procedure, chambered a round. Judah asked the accused where he was going, and he answered that he was going "hunting."[1] He pointed the weapon at Nguyen Tan Trung, who drew back, with the remark that he was no "VC." The accused lowered the rifle, then raised it again. He walked toward Patton and Nguyen Tan Trung. Holding the rifle about eighteen inches from the boy, he fired several rounds. Patton was hit in the arm. He "dove for the bottom of the tent" and crawled out. Nguyen Tan Trung was hit in "vital" areas of the chest.

Judah was "stunned" by the shots. He and Tran Van Giau sat still. The accused told Judah to leave the tent. He did. Almost as soon as he got outside, he heard a series of shots. Later examination revealed that Tran Van Giau was shot several times in "vital" areas of the chest.

Two statements about the shootings were made by the accused. Defense witness, Specialist Four Karl Bohocky, testified he was on his way to his tent

---

[1] Judah indicated that the word "hunting" meant a search for "VC."

when he "heard shots in the general area." He turned, and ran to get his weapon. However, realizing the shots had come from only "one kind of" weapon, he again turned toward the tent area. He saw the accused at the entrance to a tent. What transpired next is best revealed in his testimony on cross-examination by trial counsel:

"Q. You said when you first saw him at the door you asked him a question?

"A. Yes.

"Q. Did he understand that question?

"A. Well, he answered. He probably did because he just declared that 'They jumped me'. Well, the question was, 'What's going on' or something like that; 'What's happening', and he said, 'They jumped me'. Maybe he had that answer ready before I asked him and it was just to declare what was happening, why it was happening. He didn't answer the question, 'What was going on'. He said, 'They jumped me'.

"Q. This was in response to your question though?

"A. Yes, sir."

The accused's second statement was made in the orderly room. Although the time was not fixed, it unquestionably was made after Bohocky had spoken to the accused. Private First Class John T. Donovan, a military policeman, testified he saw the accused in the orderly room. Several other persons were present. Two apparently were talking to each other; and one said that "someone had killed two Vietnamese." Whereupon, the accused "volunteered this remark;" he said: " 'No, they're VC, they're dead.' "

Manifestly, nothing in the evidence, except the statements, provides the slightest foundation for a conclusion that the Vietnamese boys were killed in self-defense. The majority maintain the accused's statements raise the issue. I disagree for two reasons. First, the statements are, in my opinion, unalloyed hearsay and incompetent for any purpose. United States v

Harvey, 8 USCMA 538, 25 CMR 42. Secondly, even if considered as evidence, the statements fall far short of raising an issue of self-defense.

In *Harvey* we held that, unless it is part of an incriminating statement, a self-serving, exculpatory declaration by an accused ·is hearsay and inadmissible in evidence. The shooting of Nguyen Tan Trung was so significantly separated in time, and the circumstances indicating deliberation, from the shooting of Tran Van Giau as to lead the court-martial to convict the accused of unpremeditated murder in the killing of Nguyen Tan Trung, but to find him guilty of premeditated murder in killing Tran Van Giau. In the interval between the shootings, the accused ordered Judah from the tent. He waited until Judah left and, then, in single-shot order, fired at least four bullets into Tran Van Giau's chest. It is apparent, therefore, the accused had ample time to reflect on his acts. It is equally apparent, as Donovan's testimony indicates, that he had ample time to fashion a self-serving "answer" for the shootings. In this situation, the accused's statement, " 'They jumped me,' " is, in my opinion, neither a part of the *res gestae* nor a spontaneous and instinctive declaration about the shootings. Consequently, it does not qualify for admission in evidence on either of these grounds. United States v Mounts, 1 USCMA 114, 2 CMR 20. Cf. United States v Nastro, 7· USCMA 373, 22 CMR 163. Nor is the statement explicative of the accused's state of mind, either at the moment he shot Nguyen Tan Trung or the moment he shot Tran Van Giau. See United States v Bradshaw, 15 USCMA 146, 35 CMR 118. In my opinion, therefore, this statement was hearsay and inadmissible.

Similarly, the statement, " 'No, they're VC, they're dead,' " is outside the exceptions to the hearsay rule. This statement was made at a different time and at a different place from the shootings. The surrounding circumstances clearly indicate it was not an instinctive utterance prompted by the shootings. Rather, the evidence demonstrates it was a reasoned and

deliberate attempt by the accused to justify his actions. It, too, is not entitled to consideration in evaluating the evidence as to the accused's guilt or innocence. United States v Harvey, supra; United States v Murray, 15 USCMA 183, 35 CMR 155.

As I noted earlier, even if we consider the two statements they still do not indicate the shootings were in self-defense. Although no point is made of the matter by the majority, we must first determine the meaning of the statement, " 'They jumped me.' " Did the accused mean that everyone in the tent, including Patton and Judah, jumped him, or did he mean only the two Vietnamese boys jumped him? The statement made in the orderly room suggests the accused meant only the victims "jumped" him. This construction is apparently accepted by the majority. I think it is the only reasonable interpretation which can be given to the evidence. Certainly it was the interpretation accepted by defense counsel in his final argument. There, he posited a sequence of events which included the fact that the accused entered the tent and saw "the two Vietnamese for whom he has no love or trust sitting on the bunks . . . laughing and enjoying themselves."[2] The necessary consequence of limiting the accused's statement to the Vietnamese boys is that Patton and Judah emerge as mere witnesses to the events, not as participants in the alleged attack upon the accused. Their testimony as to what transpired in the tent, therefore, provides the only evidence of the setting in which the accused was "jumped."

Patton and Judah testified the Viet-

[2] As defense counsel viewed the evidence, the accused could not have been jumped when he entered the tent or at any time before he pointed the loaded rifle at Nguyen Tan Trung. He summarized the evidence in the light most favorable to the accused as follows:

". . . When you couple this factor [ingestion of alcohol] with Sergeant Condron's knowledge that he was going back out on operation and the fact that he disliked the Vietnamese, the following sequence of events does not seem to be illogical. Sergeant Condron had some form of alcohol earlier in the morning. Specialist Bohocky testified that he believed from the smell that it was hard liquor. Perhaps the heat caused it to affect him more, affect Sergeant Condron more than would normally be expected. In the back of his mind he realized that he would soon return to the field and, as so many others do every day in the field, risk his life in combat opperations. He goes to his tent to get ready to go to the field, to pick up his equipment. After entering he sees the two Vietnamese for whom he has no love or trust sitting on the bunks talking to PFC Patton and PFC Judah, laughing and enjoying themselves. He explains to himself, why should he fight in their country on their behalf and risk his life for these people while they perform menial tasks at the base camp and the relative safety of the base camp. As he gathers his equipment perhaps he thinks about this. Maybe he becomes angry as he thinks of it and PFC Patton asked Sergeant Condron where he was going. Sergeant Condron says he's going hunting, apparently an expression within that unit meaning an individual is going to the field on operations. While Sergeant Condron considers what he feels to be the inequity of the situation, what with him going to the field and the Vietnamese sitting here looking at pictures of a various nature and enjoying themselves, he becomes angry. This probably isn't so apparent to Patton and Judah. Major Bowman told us that a schizoid personality such as Sergeant Condron's does not reveal his emotions and feelings to others. Finally Sergeant Condron reaches the point he can no longer hold back the intense anger that he feels. The alcohol allows him to release his emotions and in his anger he reverts to the one reflex that is engrained in him, shoot. . . . This sudden passion unfortunately resulted in two deaths but the law recognizes that this type of hatred can influence a person when adequately provoked and provides for a lesser degree of criminality for this type of offense. It's called voluntary manslaughter."

**373**

namese boys were laughing and joking with them before the accused entered the tent. What happened when the accused came in? Did the boys jump him as soon as he entered? All of Patton's and Judah's testimony is to the effect that the boys said and did nothing aggressive toward the accused. If we accept their testimony, and there is not a shred of evidence to the contrary in the accused's statement, then the first act of aggression by anyone was by the accused when he pointed his rifle at Nguyen Tan Trung. At that moment, the accused surrendered his right to self-defense; and if he was, in fact, "jumped" by the victims of his own assault with a loaded rifle, he had no right to kill them. United States v O'Neal, 16 USCMA 33, 36 CMR 189. Did the boys jump the accused at a time when he was not committing a deadly assault against them? Certainly there is no evidence to suggest that possibility. Nor does the accused's statement tell us when and under what circumstances he was "jumped." I would not give legal effect to a statement which requires me to conjure up possibilities that have absolutely no factual support in the evidence. Nevertheless, I am willing to disregard all the evidence in the record of trial, and imagine, as the majority imagine, that the accused's statements indicate a situation in which he was "jumped" by the Vietnamese boys, without provocation on his part. Still there is no indication that he shot them in self-defense.

Basic to any claim of self-defense is that the person "on honest and reasonable grounds" believes he is entitled to kill "to save himself from death or grievous bodily harm." United States v Burse, 16 USCMA 62, 64, 36 CMR 218. Not a syllable of the "jump" statement hints at the fact that the accused feared death or grievous bodily harm from the Vietnamese boys. Nor does his later statement that they were "VC" help him. These statements do not contradict the mass of evidence to the effect the boys had no weapons, and that they were seen by the accused participating in peaceful and pleasurable activity with American military personnel in a tent in the midst of an American military compound. The "VC" statement, therefore, is totally inadequate to show the accused had "reasonable grounds" to fear he was in imminent danger of death or serious injury at the time he was "jumped." United States v Regalado, 13 USCMA 480, 33 CMR 12. I see no issue of self-defense in the evidence.

As to the character instruction, I thought the majority were wrong in ruling a similar instruction prejudicial in United States v Reloza, 16 USCMA 389, 37 CMR 9, and I think they are wrong here. Be that as it may, this case is not like Reloza.

Originally, defense counsel agreed with the law officer that there was no basis for an instruction on the effect of evidence of good character, because the evidence he had offered was not introduced for that purpose. The transcript of the out-of-court hearing on proposed instructions shows the following:

"LO: . . . Do you want instruction on character evidence?

"DC: Our purpose in calling the two witnesses was not to establish the character but rather to establish the training they were given, not to establish his character but to establish the training he had been given."

Later, in the hearing, the law officer returned to the subject. He remarked that he had "noted cases" in which there had been "criticism" of the law officer for failure to instruct on good character. Thereupon, defense counsel made the following comment: "Well, evidence of the character of the accused did come into the testimony of Lieutenant Sullivan and Sergeant Joseph, that is his character as a combat soldier and to that extent there is evidence of his good character." Trial counsel said nothing. As I read the record, it does not suggest, as the majority maintain, that there was "apparent unanimity" with defense counsel's assertion that there was evidence of good character sufficient to justify an instruction. It seems to me the reason the law officer returned to the mat-

374

ter, after counsel had explained the limited purpose of the defense evidence, was simply that he feared appellate disregard of defense counsel's statement as to the purpose and effect of the testimony of Lieutenant David Eugene Sullivan and Sergeant James S. Joseph. However, I do not rest my disagreement with the majority upon this difference of interpretation as to meaning of the testimony offered by the defense. There are more important differences between us.

The board of review below noted that the question of the accused's character "was a most unimportant part of the case." It, therefore, concluded that the "passing reference" in the instructions to the prosecution's evidence of character was not prejudicial. I fully agree with that conclusion.

I have read and reread the testimony of Lieutenant Sullivan and Sergeant Joseph. The most they say about the accused's character is that he followed instructions as to how to act in a combat situation. See Appendix. Certainly, this says a great deal in favor of the accused. But it is most important that we note the limited nature of what it says. There is prosecution evidence to the effect that accused did not follow instructions in a military situation closely related to combat. Patton testified no one was "allowed" to chamber a round in a weapon while in the company area; and Judah testified it was not "normal" to do so. Both further testified that in the tent the accused inserted a round in the chamber of his rifle. Thus, contrary to the majority's contention, there was prosecution evidence of "bad" character of the same kind as the "good" character introduced by the accused. Therefore, the law officer's instruction that the effect of the evidence of good character "may be more than offset by the prosecution's evidence of the accused's [bad] character" was fully justified by the evidence.

I am satisfied the accused received a fair trial, free from any error presenting a fair risk of prejudice as to either the findings of guilty or the sentence. I would, therefore, affirm the decision of the board of review.

APPENDIX

The whole of the testimony of each witness, so far as it mentions the accused, is as follows:

[Sergeant James S. Joseph]

"Q. [Defense Counsel] Was the accused, Sergeant Condron, a member of your platoon?

"A. Yes, he was, sir.

"Q. How long have you known Sergeant Condron?

"A. I've known Sergeant Condron since I arrived in the unit; since last April, sir.

"Q. Approximately seven months?

"A. Six or seven months, sir.

. . . . .

"Q. Do you stress any rules to the members of your platoon regarding the obtaining of fire superiority?

"A. Yes, we do, sir.

. . . . .

"Q. What rules do you stress to these people?

"A. What rules do we stress?

"Q. That's right.

"Q[sic]. Well the reaction; as far as reaction is concerned, instant reaction, sir, in applying fire power where necessary because split seconds count.

"Q. In other words an unconscious return of fire without the need of conscious thought?

"A. Well, I would call it instant, sir.

"Q. Yes, is this done on a daily basis or how is this conducted?

"A. We discuss this thing as soon as we have time, sir. Whenever we have breaks or anything like this we always talk about it.

"Q. Often?

"A. Definitely, sir.

"Q. Do the people of your platoon generally adhere to this training?

"A. Yes, they do, sir.

"Q. Have you had a chance to observe Sergeant Condron in combat operation?

"A. Yes, I have, sir.

"Q. Did he adhere to these rules?
"A. Definitely, sir.

. . . . .

"Q. [Trial Counsel] Do you teach your men to shoot without thinking?
"A. Not to shoot without thinking, sir, no.

"Q. In other words they must know what the target is, at least that it is the enemy?
"A. It's not that hard to tell a face over here, sir; when to shoot and when not to shoot."

[Lieutenant David Eugene Sullivan]

"Q. [Defense Counsel] Did you, when you were platoon leader of the 3d Platoon, conduct training with your men?
"A. Yes, sir.

. . . . .

"Q. What did you stress to them?
"A. It was always stressed that at any time when operating in the jungle if there was some strange sound or strange movement in and around your area, that you immediately became alert and took up the firing position, or if you came under fire, you immediately laid down a base fire and engaged the enemy and maintained contact.

"Q. Did you attempt to make this a conditioned reflex on the part of your people?
"A. Yes, sir, definitely.

. . . . .

"Q. Have you had Sergeant Condron on operations with you in the field?
"A. Yes, sir, I have.

"Q. Have you had a chance to observe his conduct?
"A. Many times.

"Q. Did he seem to follow your rules regarding fire superiority?
"A. Yes, sir. These are not only my rules. They are inherent in most people that are on the line, especially the person on the point.

"Q. Especially what?
"A. Especially if they are in the point squad.

"Q. Was Sergeant Condron in the point squad?
"A. Many times, yes, sir.

"Q. Then he did follow the training that you instilled in your people?
"A. Yes, sir.

. . . . .

"Q. [Trial Counsel] Do you teach your men to fire without thinking?
"A. No, sir, I don't teach them to fire without thinking.

. . . . .

"Q. Would you expect them to have this type of reflex in base camp?
"A. No, sir, I didn't at the time I'd taught that to them. I didn't expect them to have it. I expected them to have it all the time when they were in a danger situation and if the base camp is such, then yes.

"Q. If the base camp was such?
"A. If it was a dangerous condition."